[Crim. No. 1779. In Bank.—November 1, 1913.]

## THE PEOPLE, Respondent, v. DANIEL FLEMING, Appellant.

CRIMINAL LAW—APPEAL—PROVINCE OF APPELLATE COURT—CONSIDERA-
    TION OF EVIDENCE—PREVENTION OF MISCARRIAGE OF JUSTICE.—
    While the provision of our constitution restricting the jurisdiction
    of appellate courts to "questions of law alone" (sec. 4, art. VI), has
    not been in terms amended, the amendment in 1911 of section 4½
    of article VI makes it the duty of any appellate court, in consider-
    ing the questions of law presented on an appeal in a criminal case,
    to consider the "entire cause including the evidence" for the pur-
    pose of determining whether any error or erroneous procedure com-
    plained of "has resulted in a miscarriage of justice." If the court
    is of the opinion that such has been the effect, it must reverse the
    judgment. The evidence in a case, while technically sufficient to
    sustain a finding of guilt, may be so unsatisfactory as to render
    what in a plain case would be an absolutely harmless error one of
    vital importance, one affording ample ground for the conclusion
    that it has resulted in a miscarriage of justice.

ID.—DISCRETION OF APPELLATE COURT IN DETERMINING EFFECT OF ER-
RORS.—Under this amendment to the constitution an appellate court
must necessarily be vested with a large discretion in determining
the effect of errors, and each case must depend upon its own cir-
cumstances. It is the "opinion" of the court based upon a full con-
sideration of the particular record that is to control upon the ques-
tion whether the error complained of has resulted in a miscarriage
of justice.

ID.—RECORD ON APPEAL—AFFIDAVITS ON MOTION FOR NEW TRIAL—
INCORPORATION IN CLERK'S TRANSCRIPT—BILL OF EXCEPTIONS UN-
NECESSARY.—Since the changes wrought in 1909 in the sections of
the Penal Code relating to records on appeal in criminal cases, affi-
davits used on a motion for a new trial need not be incorporated in
a properly authenticated bill of exceptions in order to be considered
on appeal; where they are included in the clerk's transcript pro-
vided by section 1246 of the Penal Code, they will be considered
as a properly authenticated portion of the record. It was evidently
the design of the legislature to have the record provided for in sec-
tion 1246, as amended, and in section 1247, the new section, cover
wholly the matter of records on appeal; and subdivision 6 of section
1246 should be held to include the affidavits presented on motion
for a new trial.

ID.—MISCONDUCT OF COUNSEL—ABSENCE OF OBJECTION—REVIEW ON
APPEAL.—An appellate court will not consider a claim as to the
misconduct of a special prosecutor in argument unless objection is
made at the time. To properly present such a question on appeal
in a criminal case, the phonographic reporter's transcript of his
notes, showing the portion of the argument complained of and the
objection and action of the trial court thereon, should be brought
to the appellate court.

ID.—CRIMINAL TRIAL—EXPRESSION OF PUBLIC OPINION IN PRESENCE OF
JURY—CONDUCT OF BYSTANDERS.—While courts cannot and do not
desire to control public sentiment as to the merits of a cause, they
are required to see that it is not expressed to or in the presence of
the jury in such a way as to be likely to influence their determina-.
tion. A trial court should take every precaution to prevent any-
thing by which the jury may be overawed, or their minds influenced,
by an atmosphere surcharged with hostility or partiality.

ID.—MISCONDUCT OF SPECIAL PROSECUTOR IN REFERRING TO DISCREDITABLE
ACTS OF DEFENDANT BUT NOT OFFERING PROOF THEREOF.—Certain
statements of the special prosecutor held, under the circumstances, to
be misconduct resulting in a miscarriage of justice, within the mean-
ing of section 4½ of article VI of the constitution.

ID.—CROSS-EXAMINATION OF ACCUSED—SHOWING ASSUMED NAME.—When
there is no dispute as to the true name of the defendant, it is error
to permit the prosecution to show on the cross-examination of the

defendant that in participating in boxing matches he went under an assumed name so as to escape detection by his employer.

ID.—RESTRICTION OF CROSS-EXAMINATION AS TO INTEREST OF WITNESS.— It is error to restrict the cross-examination of a witness for the prosecution as to the extent of his interest in the outcome of the trial, where he acknowledges he has an interest therein, by showing that he has been sued for libel by the defendant for the publication of an alleged false confession of guilt.

ID.—MISCONDUCT OF SPECIAL PROSECUTOR.—It is improper for the special prosecutor in such trial to refer in the course of argument to a certain witness for the prosecution as the man "that the sleuth hounds and special agents of the Southern Pacific company tried to bribe, as shown by the records in this case," the same man "that they offered the fare to Georgia or New York," the only basis therefor being hearsay evidence which has been stricken out by the court.

APPEAL from a judgment of the Superior Court of Shasta County and from an order refusing a new trial.   J. E. Barber, Judge.

The facts are stated in the opinion of the court.

Bush & Hall, Henley C. Booth, A. A. Moore, and Stanley Moore, for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and Orr M. Chenoweth, District Attorney, for Respondent.

THE COURT.—The appellant was charged with murder and convicted of manslaughter.  He appeals from the judgment pronounced upon such conviction, and from an order denying his motion for a new trial.

It is earnestly contended that the verdict is contrary to the evidence.  It must be conceded by any fair minded person who reads the voluminous record on appeal, consisting of over four thousand pages, that even if there be sufficient evidence to legally sustain the verdict, the guilt of appellant by no means satisfactorily appears therefrom.

The deceased, George F. Vallier, was a boy of about sixteen years of age, who, with a companion named Henry Goble, a boy of the same age, had run away from his home in Tacoma.

They were "beating" their way south, with the intention of ultimately reaching San Francisco. Appellant, Daniel Fleming, a man of thirty-one years of age, was a state railroad policeman, in the employ of the Southern Pacific Company.

On August 25, 1910, at about 10:45 P. M., the first section of train fifteen of the railroad company, bound south, arrived at the depot at Redding, Shasta County, on time. The train was one of twelve cars consisting of mail, baggage, and dining cars, two tourist cars, and six standard Pullman sleepers. The seventh car from the engine was the Pullman "Edinburg," it being the second Pullman, with the "Roquefort" in front and the "Adriatic" immediately behind. As the train came to a stop at the depot, Vallier and Goble were lying on the top of the "Edinburg," a little to the south of the center. They were taken from the top of the car by Fleming, with the assistance of others. Goble was conscious, but he had an abrasion on the side of his face and a lump on the back of his neck. Vallier was unconscious and clearly very seriously injured. After being looked over on the platform at the depot, he was taken to a hospital, but died within a very short time. An autopsy had the same night showed a number of wounds. In the opinion of the doctor officiating thereat, death was due to an oval contused wound on the forehead over the left eye, underneath which blood clots had formed on the brain. There were some other wounds, one near the right eye, one (a clean incised wound) on the top of the head to the left, scratches on the nose, and contused wounds on the top and back of the head. No marks were then apparent on either the body or the throat.

The theory of the prosecution was that Fleming inflicted these injuries upon these two boys, and that he was therefore guilty of the crime of murder.

Admittedly none of these injuries was inflicted after the train arrived at the depot at Redding. According to the testimony of both the witnesses for the prosecution and the defense, after the train stopped at Redding, Fleming went up on top of the car, and without any violence whatever assisted in removing the boys to the ground. Whatever injuries were suffered by the boys had been inflicted at some time prior to the stopping of the train at the depot in Redding.

According to the testimony of Goble, the two boys had boarded the car "Edinburg" when the train passed through Delta at 8:45 P. M., at once climbing to the top. Fleming was on the train at the time, having boarded it at Ashland, Oregon, en route to Oakland. He had not been assigned to this train for active duty, but was on his way from Ashland whither he had gone in the performance of his duties, to join a north bound train at Oakland. He was not apprised of the probability of there being any person on top of the train until it had left Kennett at 9:53 P. M. Thereafter, before stopping at the Redding depot, the train had stopped only as follows: At Coram, 4.7 miles from Kennett, where it simply came to a stop and then went on at 10:05 P. M.; at Motion, 3 miles from Coram, where it took water, and left at 10:15 P. M.; and at Keswick, 7.8 miles from Motion, which it left at 10:29 P. M. The distance from Keswick to Redding is 5.7 miles, and the time was sixteen minutes, giving a rate of speed between these places of a trifle over a mile in three minutes. It is obvious that if Fleming inflicted these injuries he must have done so at one of these stops, or else have been on top of the "Edinburg" engaged in a brutal and wanton assault on the boys, while the train was in motion. The latter is the theory adopted by the prosecution, which does not intimate that there was anything to lend support to the idea that Fleming went to the top of the car at any time before it left Keswick at 10:29 P. M., unless from the testimony of certain of their witnesses to the effect that a man was standing on top of the car as it approached the Redding depot, it may be inferred that he went there when the train was at Keswick and rode from Keswick to Redding on the top of the train. The testimony of the witnesses for the prosecution put the injuries as being inflicted while the train was very near to the Redding depot, Goble testifying to the presence of the lights of what was apparently a large town, and the other witnesses claiming either to have witnessed an assault or to have seen a man standing on top of the train before it stopped, all being at most only a few hundred feet from the station. One of these claimed to have seen this man climb down from the top just before it stopped, and reach the ground, only to crawl under the train and climb up again on the other side immediately after it stopped, while two of the other three who testified to

the presence of a man on the top of the car before it stopped at Redding, substantially said that he disappeared between two of the cars before the train stopped.

Enough has been said to show that a determination that Fleming inflicted these injuries necessarily involves the determination that he either made the trip from Keswick to Redding on the top of this train, or climbed to the top while it was running at the rate of twenty miles an hour, all at great peril to himself and solely for the purpose of making a brutal assault upon some persons there whom he did not know, and against whom he could have no grievance other than that they were stealing a ride on a train of his employer. It is difficult to see what possible motive for such a proceeding on his part, full of serious discomfort and even deadly peril to himself, could have existed. The theory of learned special counsel for the prosecution to the effect, substantially, that it was a desire on his part to please his employer, is, to say the least, hardly satisfactory. And moreover a conclusion of his guilt further involves the conclusion that he put off his unlawful assault until within a few hundred yards of the Redding depot, where his presence on the top of the car and his part in the assault might be observed by those in the vicinity, seeking to escape observation in that position only when the train was just about to stop at the station, and immediately thereafter re-ascending to the top of the car to assist in taking the boys down. It goes without saying that such action on the part of a man possessing his senses is hardly conceivable.

In addition, we have testimony on the part of several persons who were on the train, which is absolutely incompatible with any idea of such action on the part of Fleming. As was said by the district court of appeal in deciding this case, the showing made by appellant "appears in the transcript to have been strong and persuasive." It is not suggested by anybody that he was on top of the train at any time before it left Keswick at 10:29 p. m., the last stop before Redding. After the train left Keswick he was seen in a car of the train by Bellus, a brakeman, and by a Mr. Mulhern, a passenger. When the train was coming into the Redding yard and up to the time it stopped at the station, during the very time that he must have been on top of the car "Edinburg" if the theory

of the prosecution be correct, his presence on the southerly platform of the car "Edinburg" or the northerly platform of the adjoining car "Roquefort" is testified to in the most positive way by a passenger, a Mr. Paul Compton of Los Angeles, by the conductor, W. D. Gill, by James T. Horgan, a special agent of the Southern Pacific Company, and by R. W. Winn, the porter on the "Edinburg." According to Mr. Compton's testimony, his interest in the matter had been aroused by the fact that just before the train reached Kennett he had heard a loud noise on the top of the car "Edinburg," in which he and his wife had accommodations, and upon inquiry of the porter, who was engaged in making up berths, was informed substantially that probably some one stealing a ride on top of the car had been hurt in the tunnel (tunnel No. 2) through which they were passing. At Kennett, when the train stopped, he had climbed to an upper berth, which he had the porter let down for him, and listening at the ventilator, had distinctly heard some one groaning or moaning on top of the car. When Fleming passed through the car shortly after the train left Kennett, Compton told him about the occurrence, and Fleming said he would investigate the matter when the train stopped. By reason of what he had heard, he was specially interested in the outcome and went upon the platform as the train neared Redding for that reason. He saw Fleming step to the ground as the train came to a stop, go out a few feet and look up to the top of the car, and immediately thereafter climb up. Through some misunderstanding, the conductor was not apprised of there being anything wrong until after the train left Keswick, and the result was that the train was not held sufficiently long at any of the other places, according to Fleming, to enable him to go to the top of the train and find out what, if anything, was wrong. After leaving Keswick, Fleming met the conductor and told him about the matter, and he, the conductor and Horgan discussed the advisability of stopping the train and investigating. However, as they were very near Redding at the time, Horgan advised that they run on in to that place and then investigate, and this, according to Horgan and Gill, was done. Gill testified that he tried to see what, if anything, was on top of the car, by attempting to climb up on the side of the car from the vestibule, while the train was in motion,

but that he could not get very far and could not see anything. Both of them testified that Fleming was with them on the platform between the "Edinburg" and the "Roquefort" until the train stopped. The porter Winn, who had likewise heard the disturbance on top of the car, was also on the platform as the train came into the station, and testified to the presence of Fleming. Fleming himself testified to the same thing. He further testified that he had started to climb up at a previous stop but that the train was starting before he got up to the top and he was compelled to jump down and get back on the train. At Keswick, which was after he had reported the matter to Horgan, he got to the ground from near the front of the train and ran to a little incline a few feet away from the car "Edinburg" where he could see the top of the car, and he saw what looked like two forms there. As the train was starting, he got back on the train and shortly thereafter found the conductor and told him about the matter, with the result already stated. According to the brakeman Bellus, he, Bellus, had been told by Horgan before they reached Keswick that they thought there was some one on the top of the train. The train stopped there to change mail, and he signaled the engineer to go ahead. Horgan complained to him afterward because he had not held the train at Keswick and he, Bellus, said he had no orders to do so. According to Horgan, there was something of a controversy between himself and Bellus because of the latter's failure to hold the train at Keswick, and a threat on his (Horgan's) part to report him. There is no question but that immediately upon the train stopping at Redding, Bellus, with a lantern in his hand, jumped off the rear end of the first tourist car, ran forward and immediately climbed to the top of the train, and ran back, along the tops of the cars to the "Edinburg." Compton's testimony as to the noise on the top of the car just before the train reached Kennett is fully corroborated by his wife, and also by the porter and a passenger named Carroll. So far as the people on the train are concerned, there was nothing to contradict the testimony of those who did testify, as above stated, in any substantial way. The story told by them is reasonable, and unless it be utterly rejected, as the creation of willful perjurers, it is impossible to understand how Fleming can be guilty of the crime charged

against him and of which he has been convicted.   In addition
to this, it is to be noted that witnesses of position and stand-
ing, among them being Father McNally of St. Patrick's
church, Oakland, and Mr. F. Mullins, chairman of the board
of supervisors of Alameda County, testified that Fleming's
reputation for peace and quiet was excellent and of the high-
est standing, and no attempt was made to contradict the wit-
nesses in any way.

The evidence relied upon as sufficiently showing the infliction
by Fleming upon Vallier of the injuries causing his death is
that of Goble, his companion, that of four witnesses who tes-
tified to seeing a large man on top of the "Edinburg" as it
came into Redding and before it stopped at the station, that
of several persons as to Fleming's appearance and conduct
at the station, and that of certain witnesses as to the nature
of the injuries received by the deceased.

The testimony as to Fleming's appearance and conduct
at the station may be dismissed from consideration with very
slight notice.   It throws very little, if any, light on the ques-
tions involved in this case.   The witnesses giving this testi-
mony substantially said that Fleming appeared nervous and
excited, and that he expressed various views as to how the
boys were injured, such as that they were drunk and fighting
and had been hurt in the tunnel.   This was the sum and sub-
stance of this testimony.   Assuming this testimony to be true,
we do not see that, under the circumstances, it assists ma-
terially in determining the question of Fleming's guilt or
innocence.

The only theory suggested by counsel for appellant on the
trial as to the source of the injuries inflicted on deceased,
was that they were caused, in part at least, by contact with
a timber in the tunnel just north of Kennett, or by something
falling upon him from the top of the tunnel.   The only basis
for this theory appearing in the evidence is the testimony of
Compton and others in the "Edinburg" as to the noise heard
from the top of the car as it was passing through the tunnel
and thereafter when the train stopped at Kennett.   There
is much in the testimony as to the condition of deceased when
seen upon the platform at Redding and the nature of the in-
juries, to indicate that some of the injuries at least were not
so caused, but there is no contradiction of the testimony of

the witnesses for the defense that something did happen on the top of the car while it was passing through the tunnel, followed by sounds indicating that some one there was seriously hurt. It is to be borne in mind, however, that it was not incumbent on defendant to show how these injuries were received, nor was it even at all essential to his innocence that deceased should have been mortally injured by coming into contact with a timber in the tunnel. In so far as anything disclosed by the testimony as to the condition of deceased and his companion, and the nature of their injuries is concerned, if we concede that some of the injuries of deceased were inflicted by some person, it is just as reasonable, in view of the testimony of the defense, to assume that they were inflicted by another than defendant, as it is to assume that defendant was the perpetrator. It cannot reasonably be argued that no one else had the opportunity. Assuming the testimony relied on by the prosecution in this regard to be entirely true, it is entirely possible that, as is said to have been suggested by Fleming at Redding, the two boys were scuffling and fighting as the train entered the tunnel and that in the melee deceased might have been partly injured by something in the tunnel and also suffered some of the other injuries shown. It was incumbent on the prosecution to show beyond a reasonable doubt that Fleming actually inflicted the injuries.

In the last analysis, the case of the people in this regard must rest upon the testimony of Goble and the four witnesses who said they saw a big man on the top of the car before it stopped at the Redding depot.

It may safely be said that uncorroborated, Goble's testimony would not satisfy any reasonable man as to the participation of Fleming, or any "big man" in any assault. He remained in Redding at a hospital from the night of August 25, 1910, until about September 3, 1910, when he returned to his home in Tacoma. But one witness testified to his saying anything during that time as to any assault, the matron of the hospital, who testified to a conversation had with him on August 26th. She testified that in the course of that conversation he said that a big man or a large man had hit him, and that he did not remember any more. No one else testified that Goble gave any intimation after being taken to the hos-

pital on August 25th, and before leaving Redding in September, that any one had assaulted either him or Vallier, although he was questioned several times as to the circumstances. He himself testified that he did not remember what occurred until some time in October. On August 26th, the day after the occurrence, he was interviewed in the hospital by Mr. Chenoweth, the present district attorney of Shasta County, who was then assistant district attorney, in the presence of a newspaper man. Goble said substantially that he and Vallier got on the car at Delta, and finally went to sleep; that he woke up feeling sick and heard Vallier moaning and asked him to keep quiet as he was afraid the trainmen would hear him; that something hit him, and that he remembered no more. Chenoweth was examined as a witness on the part of defendant as to this interview, and fully and frankly corroborated the newspaper man's testimony in the matter. Certain marks on the throat of deceased which were found when the body was examined at Tacoma created a suspicion in the minds of his relatives that he had been assaulted by some one. On September 24th the body was exhumed and further examined, in the presence of Goble, and the next day the mother of deceased and his aunt, together with Goble, started for Redding. In the mean time Goble had remembered nothing about any assault or any big man. Shortly after their arrival in Redding the mother retained an attorney, the special counsel for the prosecution in this case, and commenced an action against the Southern Pacific Company for fifty thousand dollars' damages for the death of her son, alleging that he had been killed by employees of the company. During their stay in Redding, Goble was constantly with the mother and aunt, staying in the same house with them at their expense, trying, as he said, to remember just what occurred. Hooper, who will be referred to hereafter, gave him his version of the matter, and his associates at all times were those who had conceived and were maintaining the theory that Fleming had assaulted the boys on the top of the car and had practically choked Vallier to death, and who were continually urging him to remember. This was the atmosphere that was constantly about him, until finally, one morning as he was getting out of bed and dressing himself, the whole thing came to him. This was not earlier than Oc-

tober 15th, over forty days after the occurrence. He then remembered, as told by him at the first preliminary examination, as follows, omitting the matters that preceded their going to sleep on the top of the car:

"And then George Vallier laid down and didn't say a word, and I laid down and didn't say a word, too—we was so tired and sleepy, and I don't know how long it was, I kind of woke up and looked around like that, and kind of seen the lights of some town, and just then I got struck in the side of the head, here. It kind of dazed me. I couldn't tell a minute, or second—I couldn't tell how long, and I looked up a little bit and I seen—I hollered to George, and I seen an awful large man—it looked like he had on a trainman's suit—had hold of George's throat with one hand and beating him with the other; and when this big man seen that I saw him, he just plunged over to me and hit me on the back of the neck and I can't remember anything more until I was talking to somebody here at the depot." Saying nothing about it to the mother and aunt with whom he had breakfast, he went, after breakfast, to the mother's attorney, and told his story. On October 22d he swore to these matters before a justice of the peace, and for the first time a warrant was issued for the arrest of Fleming. This story he clung to, with almost painful precision, on all occasions when he testified. On the trial on his cross-examination he said, in response to questions, that he couldn't say whether his story might not be "an imagination," that "possibly" it might. It is to be borne in mind that Goble must have seen Fleming on top of the car with him when he opened his eyes at Redding and was being assisted to the ground.

Aside from Goble, the most important witness against Fleming was a colored man named Hooper, who at the time of this occurrence was a paroled convict from the state prison at San Quentin, the judgment against him being one based upon his conviction of the crime of grand larceny. He was then working as porter at the Lorenz Hotel. He testified substantially that desiring to secure Pullman reservations for two men going south, he went north to Shasta Street, three blocks above the station, to board the train as it passed and see if he could secure reservations; that as the train passed he saw a man on top of a Pullman near the head of the train; that he

got on the step of another car and spoke through the door
to a porter in the vestibule, and the porter telling him that
they were "chock-a-block," he jumped off and ran to a car
ahead and jumped up to the lower step of another car; that
standing there he saw through the glass doors a man getting
down between the cars on the other side and come to the
ground; that he saw this man come under the car to the side
on which he was, when the train stopped, and climb to the
top of the car again, and assist in taking the boys down;
that this man picked one of the boys up and said if they did
not take him, he would throw him down. The man was Flem-
ing. The evidence is very strong to the effect that Hooper
did not tell his story to anybody until he told it to the aunt
of Vallier after she and the mother came from Tacoma to
investigate the matter.

Another one of the four witnesses referred to was a man
named Sullivan. His own testimony showed that he had
been convicted of a felony and had served a term in a state
prison in another state; that he had just served a six months'
sentence in the county jail at Redding, being released there-
from only a week before this occurrence; that he had been
working a few days in a small saloon at Redding, cooking;
that he was a drinking man and had been drinking during
the two or three days immediately preceding the occurrence.
He was hiding behind a pile of ties at or near Tehama Street,
two blocks north of the station, intending to beat his way out
of town on this train. After the engine passed, he stepped
out and "sized up the train," and saw a large man on top of
one of the cars, between two men who were lying there. This
man walked rapidly toward the southerly end of the car and
went down in between two cars. He also first told his story
to the aunt of deceased some weeks after the occurrence.

Of the remaining two witnesses, one had pleaded guilty to
the crime of forgery, had served some months of his sentence,
and had been pardoned. He likewise claimed to have seen a
large man standing on top of the train before it stopped and
two boys lying there. The other was with a girl whom he had
just met and with whom he had walked up to a park near the
depot. He was at or near the park when the train passed.
He said he saw a large man in uniform on top of the train as
it passed, and that this man disappeared at the end of the

CLXVI Cal.—24

car, apparently between two coaches. He had not told his story to any one until a few days before the trial.

Enough has been said to show the character of the testimony upon which the prosecution relied to show the presence of Fleming on top of the car before the train stopped at Redding. The only other witness who testified to observing the train as it passed either the Shasta Street or Tehama Street crossing was one F. P. McNeil, called by the prosecution to testify to the fact that Fleming appeared somewhat excited while at the depot. On cross-examination he testified that he stopped at the Tehama Street crossing, with his bicycle, as the train passed; that he observed what he thought was a man lying on top of the train, and found out afterward that there were two men there; and that he saw nobody standing on top of that car.

We have not set forth the foregoing in regard to the evidence for the purpose of establishing that it is not technically sufficient to support a verdict of guilty, for under our well established rule such a conclusion cannot be reached by an appellate court. While a full consideration of all the evidence, as shown by the record, brings us to the conclusion that it is extremely improbable that the defendant was on the top of this train at any time prior to its stopping at the station at Redding, the testimony of the four witnesses to whom we have referred, together with the other testimony on behalf of the prosecution to which we have alluded, was sufficient, if believed by the jury, to support the conclusion that the defendant did cause the death of Vallier. We may not be able to understand how the jury could have been satisfied beyond all reasonable doubt of the guilt of the defendant, in view of the testimony, but it was the exclusive function of that body to determine the amount of credit to be given to each and all of the witnesses. We have set forth the testimony showing, as we think, how extremely doubtful was the guilt of the defendant, in order that the effect of certain erroneous proceedings on the trial may the better be understood. While the provision of our constitution restricting the jurisdiction of appellate courts to ''questions of law alone'' (Const., art. VI, sec. 4) has not been in terms amended, the amendment adopted in 1911, being section 4½ of article VI, undoubtedly makes it the duty of any appellate court in con-

sidering the questions of law presented on an appeal in a criminal case to consider the "entire cause including the evidence" for the purpose of determining whether any error or erroneous procedure complained of "has resulted in a miscarriage of justice." If the court be of the opinion that such has been the effect, it must reverse the judgment. It is plain, of course, that the evidence in a case while technically sufficient to sustain a finding of guilt, may be so unsatisfactory as to render what in a plain case would be an absolutely harmless error one of vital importance, one affording ample ground for the conclusion that it has resulted in a miscarriage of justice. Under this amendment to our constitution an appellate court must necessarily be vested with a large discretion in determining the effect of errors, and each case must depend upon its own circumstances. It is the "opinion" of the court based upon a full consideration of the particular record that is to control upon the question whether the error complained of has resulted in a miscarriage of justice.

Conditions under which the defendant was tried, as shown by statements contained in affidavits filed on the motion for a new trial and not disputed, were graphically depicted in the opinion of the district court of appeal in this case. It was said that it was not disputed that defendant was tried in the center of a community where a feeling of hostility against him and his employer prevailed. Newspaper articles were published from time to time from the day of his arrest to the end of the trial, the tendency of which, according to the district court of appeal, "would naturally be to direct and mould public sentiment so as to render difficult, if not impossible, a fair trial and to influence and forestall the verdict of the jury regardless of the law and the evidence." As to the conditions of the court-room during the closing argument, the district court of appeal said:

"The situation was graphically described in one article published in a local newspaper and incorporated in appellant's affidavit, as follows: 'The superior court-room of Shasta County might have been a hall bedroom as far as its capacity to hold people is concerned, when special prosecutor Braynard made his mighty closing argument that ends a case that has been before all eyes for three months. . . . The scene at the court-house was never duplicated or even approached

in its long history. The upstairs corridors were so congested with an overflow that they were blocked. It was utterly impossible to get past the lines that were formed as there was but more compactness beyond and each man and woman was determined not to yield a step that would carry them from the sound of the great prosecutor's voice. . . . The scene presented in the court-room was extraordinary. It was packed to every foot of its standing room during the noon hour by spectators who were content to wait. A hundred found seats on the floor and the spectators' railing was no bar, a circle of spectators extending from it to the platform on which Judge Barber sat. Anything that could be utilized to sit on was taken advantage of from sticks of wood to places of vantage on railings or an elevation. Every aisle was solid and so was the space before the judge's bench. Doors could not be opened or closed and during the evening session Judge Barber gave warning to all that as the building had never been subjected to such a weight, it might give way and spectators were ordered to use their discretion in remaining. Nearly as many people clustered on the outside as were on the inside. Even the walls were subjected to a strain and windows broke with a loud crash. Officers of the court had to guard their seats to retain them. The chagrin of the defendant and the consternation of his few supporters were unpleasant to behold. They were almost crowded out of their seats by the sympathizers of the prosecution.' " To this may be added the account of the tribute to the special prosecutor when he entered the court-room before the opening of court on the day of the final argument. It was a part of the same published article from which quotations have already been made, and was as follows:

### "Riot of Applause.

"The appearance of special prosecutor Braynard in the court-room was unlike anything ever witnessed in the court-room of the county. He came in quietly, but was immediately observed, when he stepped to the platform to adjust his notes. A riot of applause came, intermingled with gusty shouts and stamping of feet, that ensued for thirty seconds and so general and thunderous was the tribute that apparently every hand and throat in the court-room participated. The prose-

cutor remained dignified and the outburst would have continued had not Judge Barber, attracted by cheers and shouts in his chamber, rushed in to demand immediate silence.''

The substantial correctness of these publications as to conditions in the court-room was declared in affidavits presented and filed. It is uncontradicted that at least two of the jurors were in the court-room at the time of the ovation to the special prosecutor. A portion of the closing argument of the special prosecutor was quoted in the opinion of the district court of appeal as follows:

"Its (the Southern Pacific Company's) all powerful and corruptive influence has been active and diligent throughout the trial and we would not be surprised that witnesses have been bribed, that jurors have been approached and subornation of perjury has been committed. However may be the effort of the Southern Pacific Company, we still have explicit faith in the personal integrity of each individual member of the jury and we do not believe that it is within the power of this lawless corporation to besmirch and degrade the good name and good citizenship of Shasta County. . . . The people haven't had any money to expend in this case. We haven't got the coin to pass out like the Southern Pacific Company usually does when it is involved in litigation in every conceivable shape and direction that they can possibly pass it, for justice. . . . We want to be reasonable, we want to be just and we expect the same treatment from you and the people of this county and this state demand it. We have offered the testimony here, we have presented the goods; and in justice to yourself, in justice to your conscience, in justice to your families and your good name, you can't afford to violate your duties by returning to this court and saying that there is a possible doubt or reasonable doubt with reference to the identification of Daniel Fleming.''

As to this the district court of appeal said that it was not within the scope and purview of legitimate argument, and that it involved an unwarranted appeal to passion and prejudice and a scarcely veiled threat that if the jurors acquitted the defendant they would be pilloried by public opinion as having been corrupted and bribed by this ''lawless corporation,'' which may have been a decisive factor in the case.

All of the foregoing matters were shown by affidavits presented on the motion for a new trial in the lower court. Copies of these were contained in the so-called "Transcript on Appeal" forwarded to the appellate court by the clerk of the superior court under section 1246 of the Penal Code, the papers and minutes contained therein being certified to be correct by the *clerk* of the superior court only. In his certificate he states that the foregoing are "full, true and correct copies of . . . application for a new trial, together with affidavits and counter affidavits relating thereto and the order denying said application." . . . Section 1246 of the Penal Code provides that the clerk's typewritten transcript shall contain, among other things, "a copy of other minutes of the action, including the proceedings on motion for arrest of judgment or new trial." The certified minutes of proceedings on motion for new trial recite that defendant's counsel presents to the court a written application for a new trial, "supported by written affidavits of Mrs. Daisy T. Reed, J. J. Harrold, Daniel Fleming, A. F. Ross and George W. Bush, said affidavits being made a part of said application, which said application with its accompanying affidavits is ordered filed and made a record of this court, said affidavits being deemed to have been read to the court." The minutes then show the filing of counter affidavits, said filing being ordered by the court, the name of the affiant in each case being stated. This is followed by copies of affidavits of each of the persons named, all bearing the file mark of the clerk showing filing by him on January 19, 1912, the day on which the motion for new trial was made and denied. No suggestion is made by either side that the record so certified, does not contain full, true, and correct copies of all the affidavits presented on motion for a new trial. The district court of appeal concluded that under the law none of these affidavits was a properly authenticated part of the record on appeal, and therefore that it could not consider any of them. This conclusion was based upon the well established rule under the statutes as they existed prior to the change in our laws relating to records on appeal in criminal cases made in the year 1909, to the effect that affidavits presented on a motion for a new trial and the minutes of proceedings on such a motion constitute no part of the judgment-roll, that the clerk cannot make them a part thereof, and that they can

be considered by an appellate court only when contained in a properly authenticated bill of exceptions. At that time, section 1246 provided for the transmission by the clerk to the appellate court of copies only ''of the notice of appeal, the record (the judgment-roll, sec. 1207, Penal Code), and of all bills of exceptions,'' and sections 1171, 1174, 1175, and 1177 of the Penal Code, provided for the making up and settlement of bills of exceptions. In 1909, sections 1171, 1174, 1175, and 1177 of the Penal Code, were repealed, leaving us without any statutory provision whatever for a bill of exceptions in a criminal case. Section 1246 of the Penal Code, was amended so as to provide for the transmission by the clerk in addition to the matters theretofore specified as constituting a part of the record (Pen. Code, sec. 1207) of 4, a copy of the demurrer, 6, a copy of other minutes of the action, including the proceedings on motion for arrest of judgment or new trial, and 9, any written or printed exhibits offered in evidence at the trial of the cause. Sections 1247, 1247a, 1247b, 1247c, and 1247d were added, providing for the transcription, certification by the reporter and by the trial judge and forwarding of ''the phonographic reporter's notes.'' It was evidently the design of the legislature to have the record provided for in section 1246, as amended, and the new section, cover wholly the matter of the record on appeal, and dispense entirely with bills of exceptions. It is clear that no authentication by the judge is required as to the matters that are to be certified by the clerk under section 1246 of the Penal Code. Section 1247 et seq., refer only to ''the phonographic reporter's notes,'' which ordinarily would not be understood as including affidavits filed in the cause, including those presented and filed on a motion for a new trial. No particular reason is apparent why a phonographic reporter should take down in shorthand the contents of affidavits so presented and read to a court and filed in the cause, and we know as matter of fact that in practice he does not do so. The affidavits themselves present for all purposes the best evidence of their contents. We find nothing in section 1247 et seq. contemplating that the phonographic reporter's notes shall contain a statement of the matters shown by affidavits filed in the cause, and do not feel warranted in concluding that it was intended that such affidavits should be presented to an appellate court as a part

of the phonographic reporter's transcript. If then such matters are not covered by section 1246 of the Penal Code, as matters to be certified by the clerk, there is no statutory method by which they may be presented to an appellate court. Such certainly could not have been the contemplation of the legislature. Section 1246 of the Penal Code, should be liberally construed, of course, with a view to enabling a defendant to bring up all matters properly cognizable by an appellate court. It is not an unreasonable construction of subdivision 6 of the section to hold that it includes the affidavits presented on motion for a new trial, and we think it should be so construed. Of course, the affidavits set forth should be so referred to and identified as to make at least a *prima facie* case that they are the precise and only affidavits presented on the motion, and this was done here. We cannot see that such a practice would be in any way loose or uncertain, or productive of bad results. It is not to be doubted that an appellate court has full power in the event that it is suggested that the clerk's record as to the matter of such affidavits is in any way defective or inaccurate, to determine the facts in regard thereto, and to require the clerk to make his record conform to the facts. The practice which we believe to be intended as to affidavits, is undoubtedly expressly provided for as to ''any written or printed exhibits offered in evidence at the trial of the cause'' (Pen. Code, sec. 1246, subd. 9), and any objections on the ground of policy that could be urged as to affidavits could, with equal force, be urged as to exhibits. We are of the opinion that the affidavits here should be considered to be a properly authenticated portion of the record on appeal. We are not, however, to be understood as holding that we would refuse to consider them if they were included in the reporter's transcript which is certified by the trial judge. That is a question not presented. But if we felt that we could not consider them if presented only in such a manner, we would order the clerk to send up a correct record showing the affidavits.

As to the matters heretofore stated to be shown by the affidavits in relation to the argument of the special prosecutor, while we feel that portions thereof were subject to the criticisms stated by the district court of appeal which we have already set forth, it does not appear that objection was

made by counsel for defendant at the time. It is now well settled that an appellate court will not consider a claim as to the misconduct of counsel in argument unless objection is so made. To properly present such a question on appeal in a criminal case, the phonographic reporter's transcript of his notes showing the portion of the argument complained of, and the objection and action of the trial court thereon, should be brought to the appellate court. As we are satisfied that the judgment should be reversed for other reasons, we do not deem it necessary to comment on the other conditions shown by the affidavits, further than to say that they were of such a nature as to be likely to have a most prejudicial effect on the defendant's cause. While the courts cannot and do not desire to control public sentiment as to the merits of a cause, they are required, if there be anything in the guaranty of a fair and impartial trial, to see that such public sentiment is not expressed to or in the presence of the jury in such a way as to be likely to influence their determination. It goes without saying that a trial court should take every precaution to prevent anything by which, to use the words of the supreme court of South Carolina in *State* v. *Weldon,* 91 S. C. 40, [39 L. R. A. (N. S.) 667, 74 S. E. 45], the jury may "be overawed, or their minds influenced by an atmosphere surcharged with hostility or partiality." The affidavits do, however, make apparent certain conditions existing at the trial, proper to be taken into consideration in determining the prejudicial effect of certain errors, which we shall now refer to.

When P. J. Kindelon, chief special agent for the Southern Pacific Company, was on the stand, he was asked on direct examination by Mr. Hall of defendant's counsel the following question, viz.: "Since Daniel Fleming has been a railroad police officer under your supervision, what has been his record with the company?" This was objected to by the special prosecutor. In arguing his objection, the special prosecutor said: "This man says that he professes to know something about his record. I will say to counsel on the other side, if you consider this testimony material and relevant, will you object to us coming along with what we know of and concerning his record? If we will permit Mr. Kindelon to testify to what he knows about his record, will you open the door, and let us in to prove or establish certain acts and such

things as that, concerning his record?" Mr. Hall said: "Why, certainly, anything. Open the door wide as to any single act of Daniel Fleming." Mr. Braynard (the special prosecutor) then said "All right; we will withdraw our objection." Mr. Hall then stipulated that the prosecution's proof in the mattter must not be mere hearsay evidence, and Mr. Braynard said "No, by eye witnesses." The witness answered the question as follows: "His record for the six years that he worked for me is good, and there was no complaint against him as a police officer in that time." On crosss-examination Mr. Braynard asked the witness: "During your service for the Southern Pacific Company as chief special agent, during your whole service as such, has any complaint ever been made to your office, or have you ever heard any complaint made generally by the public about the manner that people have been beaten up and misused by train policemen on their train?" This was objected to and the objection was overruled after some discussion. Thereupon Mr. Braynard made a statement saying, among other things, that he felt that the ruling of the court "has been wrong with reference to this line of testimony," and "we now would like to withdraw this question, so that there can possibly be no error in this record," and that "we don't desire the rights of the people to be prejudiced by the admission of certain testimony which we know, if we go back and cross-examine concerning, they will take their objection, they will make a record, and it will be clear error if this case should hereafter be considered by the supreme court of this state." The question was then withdrawn. Later, however, he asked the witnesss: "Did you ever hear anybody speak about his knocking a man off the train and breaking his leg?" and the witness answered "No, I didn't." This was followed by "Q. On this division? A. I never did. Q. Never did? A. No complaint of that kind ever came to me. . . . Q. Did you ever hear of his putting a man off the train on this division, and beating him up after he was on the ground, and throwing him into a barbed-wire fence? A. No. He never beat a man up in his life. Q. Oh! You know that, do you? A. You bet I do. Q. Yes? A. I am the man that knows it, too. . . . Q. You never heard of him knocking a middle age man down off the train on this division, and abusing him, and while abusing him,

standing over him with his feet placed on his legs or ankles, have you? Mr. Hall: Now, if your honor please, unless counsel is prepared to back these questions up with proof, we desire to object to them, and assign the asking of the question as prejudicial error. Now we want them to be prepared to back up any of these questions that they ask. Mr. Braynard: Now, do you want us to do those things? Mr. Hall: Why, we surely do. Mr. Braynard: And you won't object to them? Mr. Bush: We told you before we wouldn't. Mr. Hall: Bring in the proper proof. Mr. Braynard: We will bring in eye witnessses. Mr. Bush: Well, that is what we want. Mr. Braynard: All right, we will bring them. Mr. Hall: Bring in a man who will identify this defendant. Mr. Braynard: O, we will identify him when we start to. Is that all your objection? Mr. Hall: We are just giving you warning, and assigning it as prejudicial error in advance, if you don't do it, that is all.'' The witness then answered the question in the negative. It is not disputed that no testimony was thereafter offered by the prosecution referring to these matters, and that no disavowal was thereafter made by the prosecution as to its ability to produce proof of the matters suggested by the special prosecutor.

We are of the opinion that the whole of this altercation was improper, and that it cannot be held, under the circumstances, to have been without prejudice to the substantial rights of the defendant. The vice of the matter was not in the mere asking of the three questions on cross-examination as to whether the witness had heard certain specified things about the defendant, but was in the expressions of the special prosecutor running throughout the altercation to the effect that the prosecution could produce proof along the lines of such three questions, and was only deterred from doing so by the fear that it might be held to be a prejudicial error by an appellate court and bring about a reversal of a judgment of conviction. Such we think was the clear intimation conveyed by the conduct of the special prosecutor in this matter, and we can conceive of no other reason for such conduct than the desire to convey to the jury such an intimation. This conduct on his part was not invited by counsel for defendant. While the first question asked Kindelon by Mr. Hall as to the record of defendant with the company may have been objectionable,

it constituted no ground or invitation for the proposition made in response thereto by the special prosecutor. That proposition was a plain statement to the effect that the prosecution knew things concerning defendant's record that were discreditable to him, and which they could prove by eye witnesses if the rules of evidence permitted proof thereof or if the defendant would not interpose any objection thereto. The nature of these things was shown by the subsequent questions of the special prosecutor on the cross-examination of Kindelon, viz., acts of violence and brutality on the part of Fleming toward men found endeavoring to steal rides on the Southern Pacific Company's trains. It is too plain for discussion that the showing of any such matters would be extremely prejudicial to defendant's cause. Such conduct as was thus attributed to Fleming would naturally and justly be abhorrent to any person possessing a spark of humanity, and would go far toward inducing a conclusion that if he had done such things before he might well be guilty of the brutal crime charged against him in this case. In his reply to the proposition thus made in the presence of the jury, counsel for Fleming, if satisfied that no such proof existed, simply adopted what was probably the most efficacious way of removing the impression that would otherwise have been caused by the making of the proposition. The subsequent statement of the special prosecutor in regard to not making any such proof solely because the admission thereof would constitute legal error, requiring a reversal in the event of conviction, did not assist. It was simply saying, in effect, "we have the proof, but we prefer to take no chances of a reversal and for that reason alone, we will not offer it." While it is true that defendant could not have complained on appeal of the admission of proof of such matters if he had interposed no objection thereto, the jury could not have known this, and the plain effect of the statement was that the prosecution had such proofs, but could not make them because the laws of evidence precluded such a course. The statements of the special prosecutor in his altercation with defendant's counsel in the course of the cross-examination clearly and emphatically reasserted the existence of such proofs. And at no time was any disavowal of the existence of such proofs made by the prosecution, the result being that

the impression which must have been created by the statements of the special prosecutor was allowed to remain.

In view of the very grave doubt as to the guilt of the defendant of the crime charged against him, and in view of the nature of the acts charged against defendant as shown by the testimony of the witnesses for the prosecution, we are of the opinion that, despite the general instructions of the court to the jury to the effect that they must base their verdict exclusively on the evidence, the conduct of the special prosecutor in the matters we have been discussing, which clearly constitute misconduct on his part, contributed materially to the verdict that was rendered. (See *People* v. *Derwae,* 155 Cal. 592, [102 Pac. 266].) So believing, under the circumstances we have heretofore stated, we consider the case one in which section 4½ of article VI of the constitution contemplates a reversal on account of an error or erroneous procedure resulting in a "miscarriage of justice." (See generally what is said in the opinion of Mr. Justice Sloss in *People* v. *O'Bryan,* 165 Cal. 55, [130 Pac. 1042].) So far as we can see defendant's counsel have sufficiently presented the question of prejudicial misconduct in this regard on appeal, and all the matters in connection therewith are shown by the phonographic reporter's transcript certified to by the trial judge.

The trial court permitted the special prosecutor to ask the defendant, when being cross-examined, if he had at any time assumed or gone by the name of Bob Clement, or by any other name than that of Daniel Fleming. Over specific objection that, among other things, the question was intended for the purpose of degrading the witness, he was required to answer, and said that he had assumed the name of Bob Emmett. The court erred in allowing the question, under the circumstances existing in this case. (See *People* v. *Mohr,* 157 Cal. 734, [109 Pac. 476].) There was no dispute whatever as to the true name of defendant, and obviously the sole purpose of seeking such proof was to reflect discreditably on the defendant by showing that he went under an assumed name, a thing, as said by this court, "not conducive to a good character for defendant." (*People* v. *Arlington,* 123 Cal. 357, [55 Pac. 1003].) Of course it is claimed that the testimony, in the light of the subsequent explanation by defendant, could

not have injured him in the minds of the jurors, and in fact, counsel make quite an effort to show that the facts in the matter are rather to his credit than otherwise. The explanation came in answering questions of the special prosecutor designed to elicit answers showing that defendant had participated in boxing contests held under the auspices of the Reliance Club of Oakland, of which defendant was apparently an athletic member. All the evidence concerning this matter was entirely irrelevant, and all came in over the objection of defendant. The substance of defendant's testimony in this regard was that while employed by the Southern Pacific Company he participated in three or four such boxing contests, the same being four-round contests, under the name of Bob Emmett; that he was forced into the first of these contests as a substitute; and that "the club or the man that was running the club" gave him the name of Bob Emmett because the Southern Pacific would not "stand for" any one in its employ boxing, and he would have lost his position had it been known by his employer that he was engaging in these contests. Outside of these contests he was known about the club as Daniel Fleming, by which name he appeared on the rolls of membership. The standing of the Reliance Club as a respectable business men's and all-around athletic club would probably not be questioned by any one who knows the facts in regard thereto, but so far as this jury was concerned, such standing was vouched for only by the testimony of defendant. People look at things differently, and we would indeed be ignorant as to existing conditions if we did not know that some people do not look with favor upon a man who engages in what they consider "prize fighting," even though the same be by amateurs as distinguished from professionals, and under the auspices of a club. We cannot tell how the various members of the jury regarded such matters. Obviously learned counsel for the prosecution did not think it would improve the standing of defendant with the jury to be known as a participant in such contests. But without regard to this, defendant was necessarily placed in the position of being compelled to admit that he had knowingly violated the regulations of his employer by so participating in such contests, and that he had assumed another name than his own for the purpose of escaping detection. Clearly this

was not entirely creditable to defendant, and while perhaps most people would not have attached any particular significance to it in determining whether he was guilty of a brutal assault on Vallier, others would. The evidence in regard to these matters was improperly before the jury for its consideration, having been admitted by the trial court over objection. If it was the determining factor with even one juryman it materially contributed to the verdict, and in view of, to say the least, the closeness of this case on the evidence, and the very grave doubt as to defendant's guilt, it appears to us to be only reasonable to conclude that it did materially contribute to the verdict.

We are also of the opinion that the trial court unduly curbed the cross-examination of Mr. Davis, a witness for the prosecution, on the question of his interest in the outcome of the case. The fact that he acknowledged having an interest or the further fact that he acknowledged that there was a libel suit pending on the part of Fleming against the newspaper of which he was one of the owners, did not preclude defendant from further cross-examination as to the *extent* of his interest. And this was all that the defendant was doing when, the witness having said that he had no financial interest in a conviction, he asked him why he had no financial interest, and the trial court sustained an objection. And this also was what defendant was trying to do when he asked the witness if the article complained of in the libel suit was not one published at the time of his arrest in which it was substantially said that he had practically confessed his guilt, and if the article was not untrue in this respect. Of course, if these questions had been answered in the affirmative, the financial interest of the witness in the establishment of Fleming's guilt would be all the more apparent, and the jury was entitled to know the fact in considering his testimony. Defendant's counsel expressly stated to the court what they expected and offered to prove in this connection and the court sustained an objection thereto. The offer was in the following language: ''We offer to show by this witness, that that paper published an article which was false—a statement that Fleming had confessed his guilt, and that by reason of that article, that Fleming commenced a $10,000 damage suit

against him, and we desire to show his interest in securing a conviction in this case.''

A portion of the argument of the special prosecutor which is assigned as misconduct is contained in the phonographic reporter's transcript, with the objection of defendant thereto, and is reviewable here. Therein, counsel referred to Hooper as the man "that the sleuth hounds and special agents of the Southern Pacific Company tried to bribe, as shown by the records in this case," the same man "that they offered the fare to Georgia or New York." This was an improper statement to make in view of the fact that the only basis for it was certain hearsay evidence which had been stricken out by the court. However, the jury was specially instructed to disregard this statement of counsel.

There is no other matter requiring consideration here, in view of our conclusion upon the matters already discussed. Upon the whole case we are satisfied from the record that the interests of justice demand that a reversal should be had.

The judgment and order denying a new trial are reversed.

### QUALIFIED CONCURRENCE OF THE CHIEF JUSTICE.

BEATTY, C. J.—If I were justified in assuming the correctness of the statement of facts contained in the opinion of the court I should unhesitatingly concur in the judgment of reversal. But by section 4½ recently added to article VI of the constitution, this court (and each of its members) is forbidden to reverse a judgment of conviction in any criminal cause for error or abuse in pleading or procedure, unless after an examination of the entire record *including the evidence* it is of the opinion that the error has resulted in a *miscarriage of justice.* The construction of this provision depends upon the meaning of the phrase "miscarriage of justice." Evidently errors and abuses in matters of procedure do not constitute a "miscarriage of justice" for the provision assumes that they may not result in such miscarriage, and that the presumption that they have not so resulted must prevail until an examination of the evidence has overcome that presumption. What, then, is a "miscarriage of justice." The ordinary use of the phrase hitherto has been to characterize a case in which a person notoriously guilty of some serious offense has escaped conviction through some fault of those

responsible for the enforcement of the law. The state, in prosecuting an offender, is seeking only justice and the failure to convict where the evidence of guilt is clear is properly denominated a *miscarriage*. This, however, is not the sort of case that ever comes to the supreme or appellate court. Appeals lie only in cases of conviction as the result of a trial, and a "miscarriage of justice" in such cases can only mean the correlative of such miscarriage in cases of acquittal, viz.: the conviction of a person who is probably innocent. For an opinion upon a question of fact—the question of guilt or innocence of which we are given jurisdiction by the amendment —must have at least a probability to support it—not necessarily demonstration, of course, but necessarily the weight of evidence. If this is the true construction of the amendment—and I can see no room for another—then it is a solemn duty devolved upon every member of the appellate tribunals, charged as they are with the decision of questions of fact involving life and liberty—not merely to read hastily and cursorily the evidence allowed to go to the jury, and that excluded by the court, but to read it with close attention, weighing and balancing it, availing themselves of such slight aids as the cold record may afford for estimating the credibility of witnesses whose manner and appearance on the stand they have never seen.

Entertaining these views, and because in this case I have never found the time to read the forty-four hundred pages of typewritten record even in the most cursory manner, I do not feel qualified to concur in the judgment.