[Crim. No. 903.   Second Appellate District, Division One.—November 2, 1922.]

THE PEOPLE, Respondent, v. JOSEPH STUDER, Appellant.

[1] CRIMINAL — MANSLAUGHTER — VIOLENCE TOWARD DECEASED—HEMORRHAGE—VERDICT—EVIDENCE.—In this prosecution in which the defendant was charged with the crime of murder and convicted of the crime of manslaughter, the testimony as to the acts of violence of defendant toward his mother, coupled with the testimony of medical experts showing that the death was directly caused by a hemorrhage in the fourth ventricle of the brain, was legally sufficient to sustain the verdict.

[2] ID.—EVIDENCE—QUARRELS WITH OTHERS—PREJUDICIAL ERROR.— In such prosecution, the trial court committed error in the reception, over defendant's objection, of testimony concerning quarrels between defendant and his brother and with a neighbor several hours before the difficulty with his mother, it not having been shown that such previous conduct was in any way connected with the subsequent attack upon the deceased, or that it had in any way contributed to her death; and the admission of such testimony constituted prejudicial error.

[3] ID.—DISTURBANCE OF PEACE—RESULTANT DEATH—MANSLAUGHTER. If a person creates a scene of commotion amounting to a disturbance of the peace, and through excitement thus induced in the nervous system of a bystander, a hemorrhage is caused in the brain of the bystander, and death results therefrom, and if the jury finds that such death was a natural and probable consequence of such disturbance of the peace in the presence of the deceased, then the author of such disturbance may be convicted of manslaughter. (On petition for hearing in supreme court, approval withheld.)

APPEAL from a judgment of the Superior Court of Los Angeles County.   Russ Avery, Judge.   Reversed.

The facts are stated in the opinion of the court.

Wm. T. Aggeler, Public Defender, and Frederic H. Vercoe, Chief Deputy Public Defender, for Appellant.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, and Thos. L. Woolwine, District Attorney, for Respondent.

CONREY, P. J.—The defendant was charged with the crime of murder and convicted of the crime of manslaughter. He appeals from the judgment of imprisonment and from an order denying his motion for a new trial.

Appellant does not claim that the evidence is legally insufficient to sustain the verdict of the jury. But he claims that it is barely sufficient, and that errors occurred which seriously prejudiced him in relation to his right to a fair trial.

On September 25, 1921, appellant was living at 514 South Concord Street, in the city of Los Angeles, with his brother John and their mother Elizabeth Studer. She was eighty-six years old and for some years had been suffering from chronic nephritis, commonly known as Bright's disease. She was also suffering from an enlarged left ventricle of the heart, accompanied by arterial sclerosis and high blood pressure. The evidence received by the court described certain conduct of appellant on the day mentioned, culminating at a point where, according to one witness, Mrs. Studer was pushed out of the house by appellant. She then walked toward the house of a neighbor, Mrs. Birch, who lived in the second house north of the Studer residence. Mrs. Studer was assisted into this house by Mrs. Waddell, who lived next north of the Studer house, and by Mrs. Henderson, who lived across the street. There she sat in a chair for about half an hour and then became unconscious. During that half hour she talked naturally but complained of suffering some pain. Shortly after 6 o'clock in the evening, which was two hours or a little more after her arrival at the Birch house, Mrs. Studer was taken to a hospital, where she died that night. The evidence shows, and the fact is not contested, that her death was directly caused by a hemorrhage in the fourth ventricle of the brain.

The only testimony of eye-witnesses claiming to have observed any acts of violence of appellant toward Mrs. Studer was given by Mrs. Henderson and by a thirteen year old girl named Daisy Sherbondy. The back porch of the Henderson house is located about 150 feet from the front door of the Studer house, and there are no intervening obstacles to the view. According to the testimony of Mrs. Henderson, soon after 3 o'clock on the afternoon of Sunday, September 25, 1921, she heard loud talking by male voices,

and looked through the screen of her porch and across
toward the Studer house. She saw John Studer on the
street opposite the Waddell house, Mrs. Studer on her front
porch, and Joseph directly behind her. John walked up the
street northward, Joseph backed into the house, Mrs. Studer
walked in and closed and latched the screen door. "She
stood right in front of the screen and he directly in front
of her, and he shook her this way and this way (indicat-
ing), and then he pitched her to the side—that is, this
way (indicating); pitched her over that way." He had
hold of her apparently by the arms. He kicked the door
shut. About two minutes later Mrs. Henderson started across
the street and at that time saw Mrs. Studer on the lawn
near her house. Mrs. Waddell also came out from her own
house, and the two helped Mrs. Studer walk up the street
to the Birch house, where Mrs. Birch came out and took
the place of Mrs. Henderson.

Daisy Sherbondy lived in the third house south of the
Studer house. Her testimony is that at some time after
3 o'clock, on the same afternoon heretofore mentioned,
she went to visit a friend at a house located at the rear of
her home and facing on Bernal Avenue. Her attention was
attracted by loud talking, and she walked across lots a dis-
tance of about 103 feet to a gate at the back of the Studer
lot, and stood at a point where she could see the steps at
the rear of the Studer house, where there was a back porch
with a screen door from which there were steps leading
down to the yard. She saw Joseph Studer open the door
with his foot. His mother was standing beside him. His
left arm extended back of her and his right hand was on
her right arm. He then pushed her and she fell on the
steps. "Q. Now, .did you hear Joseph Studer say any-
thing as he stood in the doorway there? A. I think he said
'Beat it.'" The witness then turned and ran home, Mrs.
Studer being still on the steps.

Taking the testimony of these two witnesses together, and
assuming its truth, it is reasonably probable that the in-
cident described by Miss Sherbondy immediately followed
the incident at the front door as described by Mrs. Hender-
son, and that immediately following these two transactions,
Mrs. Studer walked around toward the front of the house,

where she was assisted to the Birch house as before described.

[1] There is evidence legally sufficient to prove that the actions of the defendant were the cause of the death of his mother. For instance, Doctor Louis Weber, who qualified as a specialist on diseases of the brain and nervous diseases, answered in response to a hypothetical question that the acts of the defendant (being substantially those to which we have referred), together with the attendant circumstances of excitement and commotion, also assumed in the question, superinduced the hemorrhage whereby the death was caused. We do not overlook the fact that there were other and different expert opinions about this matter; but that does not concern us at this time, since it is at least made clear that there is a chain of evidence here which is sufficient to sustain the verdict.

[2] Appellant claims that the court committed certain errors in the reception of evidence. Mrs. Waddell testified that during the morning of said day she saw Mrs. Studer on Mrs. Studer's front porch and around her premises; that at about noon she heard loud talking and swearing at the Studer house; that Joseph was "hollering after his brother John" using such phrases as "Jesus Christ," "God damn it to hell," "To hell with your church." The witness testified that at about the same time she heard sounds from the Studer house, such as sounds of dishes being broken. At about a quarter past 12, and after the witness heard the said loud talking, John Studer went up the street. The sounds as of objects being thrown in the house did not occur until after John left. Mr. Louis Waddell testified to some of these same facts about what occurred at noon. He also testified that at about noon, while he was standing on a ladder in his own yard, appellant came out into the Studer back yard and there called witness a "God damn coward," and dared him to come down and fight. The evidence shows that John Studer had returned home before 3 o'clock. Mrs. Waddell testified that at some time between 2 and 3 o'clock she again heard loud talking over there. The voices were both John's and Joseph's, who talked like they were quarreling. Again John left the house and went up the street. There is no evidence that he came back again during that day.

Appellant contends that all of this testimony relating to what occurred between John and Joseph, and between Joseph and Mr. Waddell, should have been excluded, and that the court erred in overruling his objections thereto. He claims that there is no evidence that the decedent was present while the loud talking or quarreling and noises described were going on, or that the defendant swore at or quarreled with his mother. Although the witness did not testify to the presence of Mrs. Studer in her house at the precise moment of those occurrences, there is ample evidence that she was there throughout the day.

It must be conceded that there is no testimony that the defendant was swearing at or quarreling with his mother while these things were occurring, or at all. No act or word of his appears to have been directed toward her, other than the acts of shaking her by the shoulders as described by Mrs. Henderson, and the acts described by Miss Sherbondy.

Appellant objected to the testimony concerning the incidents which occurred at noon, and concerning the conduct of appellant toward the witness Louis Waddell. The objection was, that unless the language used by Joseph was addressed to his mother, the evidence was incompetent, irrelevant and immaterial. This objection should have been sustained. The facts then sought to be proved were not part of the *res gestae* of the alleged crime. They merely proved a quarrel between the two brothers, in the house where their mother was, at a time three hours before the alleged acts of violence. In that interval of three hours, so far as the evidence shows, the defendant may have been entirely peaceful and quiet. There is no testimony showing any nervous excitement or disturbance of Mrs. Studer during that time. If the testimony concerning these 12 o'clock incidents had been offered for the avowed purpose of proving that the defendant had a quarrelsome disposition, or that he was a man who used profane language in the presence of women, no doubt the court would have refused to permit such testimony, because the people were not entitled to prove the defendant's temperament or his vocabulary, as evidence of his guilt in the case at bar. However, this result was accomplished, under color of an attempt to treat distinctly separate acts as one continuing act,

whereby it was argued that great mental excitement was produced in the deceased by these disturbances in her presence. The case is not at all parallel to those cited by respondent, wherein, as counsel say, a series of "continuous and uninterrupted acts ending in the complete crime," may be proved. We think that the court erred in admitting said testimony. And we further are of the opinion that the defendant was prejudiced thereby, because the case against him, on the entire record, is not of that clearly strong character which reduces the comparative importance of such errors. (*People* v. *Fleming,* 166 Cal. 357, 370 [136 Pac. 291].)

The defendant denied all of the acts of violence charged against him. He testified that when his mother came in from the front porch she had a "dizzy spell," and walked toward him; that her body was swaying unsteadily, when she caught hold of him; that he carried her to a couch, and ministered to her needs. Dr. E. B. Studer, a son of deceased, and Mrs. Van Vlack, her daughter, testified that Mrs. Studer sometimes had such attacks of dizziness. It thus appears that there was very positively conflicting evidence on the most important question concerning the conduct of the defendant toward his mother. Therefore it well may be that, except that the jurors were prejudiced against him by the irrelevant evidence relating to his conduct earlier in the day, the testimony favorable to the defendant would have had greater weight in their minds.

The court gave to the jury the following instruction: "Every person is responsible for the natural and probable consequence of his acts. If you are satisfied from the evidence beyond a reasonable doubt that the defendant, Joseph Studer, did create a scene of commotion amounting to a disturbance of the peace, or committed any act of violence upon Elizabeth Studer by laying his hands on her, or that the defendant, Joseph Studer, forced his mother out of doors, and that she suffered a hemorrhage of the brain from which she died, and you are further satisfied beyond a reasonable doubt that this scene of excitement or the violence, contributed to her death, or that her death was one of the natural and probable consequences of his acts, even though Elizabeth Studer herself contributed to bringing about that hemorrhage by the exertion of walking up a hill or grade,

still you should find the defendant, Joseph Studer, guilty of manslaughter. And this is so even if Joseph Studer did not intend to kill Elizabeth Studer, if you are satisfied beyond a reasonable doubt that the hemorrhage was brought about or precipitated as a natural and probable consequence of such acts on the part of the defendant, Joseph Studer. The only elements of intent which it is necessary for the prosecution to establish is the intent on the part of the defendant, Joseph Studer, to have maliciously disturbed the peace, and to have committed any unlawful acts of violence upon Elizabeth Studer, if you so find from the evidence beyond a reasonable doubt that such disturbance of the peace was created and such acts of violence committed by the defendant, Joseph Studer.''

Counsel for appellant earnestly contends that the foregoing instruction is erroneous because it directed the jury that a disturbance of the peace by the defendant might be considered by them, even though such disturbance was not directed against the decedent personally, and even though such decedent was not present at the time of such disturbance of the peace; also because the instruction in effect told the jury that if appellant created any disturbance of the peace *or* committed any act of violence upon the decedent, then if such disturbance alone contributed to Mrs. Studer's death, the jury might find appellant guilty of manslaughter regardless of any act of violence. We are satisfied that under this instruction the defendant could have been found guilty even though he committed no act of violence toward his mother and notwithstanding the fact that none of the disorderly words used by him were addressed to her. [3] According to the instruction, it is the law that if a person creates a scene of commotion amounting to a disturbance of the peace, and through excitement thus induced in the nervous system by a bystander, a hemorrhage is caused in the brain of the bystander, and death results therefrom, and if the jury finds that such death was a natural and probable consequence of such disturbance of the peace in the presence of the deceased, then the author of such disturbance may be convicted of manslaughter. Following the only decision that we have been able to find which seems to have determined this question, we have reached the conclusion that the instruction as given

is a correct statement of the law. (*In re Heigho,* 18 Idaho, 566 [Ann. Cas. 1912A, 138, and note, 32 L. R. A. (N. S.) 877, 110 Pac. 1029].) There is such a thing as involuntary manslaughter resulting from the commission of an unlawful act not amounting to felony, the killing being without malice. (Pen. Code, sec. 192.) Such an act may amount to manslaughter, although the defendant did not intend to kill any person. But the fact that the quoted instruction is without fault as a statement of the law only further emphasizes the importance of those errors in reception of evidence, to which we have referred.

There are numerous other assignments of error in the argument for appellant. These relate to claimed errors in rulings on evidence; to asserted misconduct of the district attorney; to instructions given, and to refusal of the court to give instructions requested by the defendant. We deem it unnecessary to determine or discuss these points at this time.

The judgment and order are reversed.

Shaw, J., and James, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 28, 1922, and the following opinion then rendered thereon:

THE COURT.—The petition for a rehearing is denied.

The opinion contains this passage: "According to the instruction, it is the law that if a person creates a scene of commotion amounting to a disturbance of the peace, and through excitement thus induced in the nervous system of a bystander, a hemorrhage is caused in the brain of the bystander, and death results therefrom, and if the jury finds that such death was a natural and probable consequence of such disturbance of the peace in the presence of the deceased, then the author of such disturbance may be convicted of manslaughter."

We withhold our approval of this passage so far as it holds that the death of the bystander is all that is necessary to constitute the crime of manslaughter under the circumstances related. It was not a mere bystander who was the

victim of the circumstances and that question is not involved in the case.

Shaw, C. J., Waste, J., Lennon, J., Lawlor, J., Sloane, J., and Ward, J., concurred.