[Crim. No. 5813.   In Bank.   July 3, 1956.]

THE PEOPLE, Respondent, v. PHILIP J. WATSON,
Appellant.

820

Leslie C. Gillen, Gregory S. Stout and William F. Cleary for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, Victor Griffith and John S. McInerny, Deputy Attorneys General, Thomas C. Lynch, District Attorney (San Francisco), and Cecil F. Poole, Assistant District Attorney, for Respondent.

SPENCE, J.—Defendant appeals from a judgment of conviction of second degree murder. His wife, Arlys Watson, was killed on February 15, 1953, in their San Francisco apartment. Defendant's conviction rests on circumstantial evidence. He does not challenge the sufficiency of the evidence to support the conviction, but he argues these points as grounds for reversal: (1) the restriction of the defense's cross-examination of one of the prosecution witnesses, Officer Mullen; (2) the giving of an instruction that neither the prosecution nor the defense was required to call as witnesses all persons present "at the events involved in the evidence";

(3) the refusal of an instruction requiring, in substance, that each essential fact in a chain of circumstantial evidence must be proved beyond a reasonable doubt; and (4) the overruling of the objection to certain cross-examination of defendant. Only points (3) and (4) raise any serious question, but a review of the records leads us to the conclusion that there was no prejudicial error resulting in a "miscarriage of justice," and the judgment of conviction should therefore be affirmed. (Cal. Const., art. VI, § 4½.)

In February, 1953, defendant was 26 and his wife was 22. He was then an Army corporal, stationed in San Francisco, and was due to be discharged on March 19, 1953. The couple were married in June, 1952, and lived in an upstairs furnished apartment. Apparently there was no particular friction between them.

February 15, 1953, was a Sunday. At 7:00 that evening defendant telephoned to the police that he had just found his wife dead in their apartment. Officer Mullen was the first official at the scene. Defendant met him there and took him to the bathroom, where he found Arlys lying in the bathtub, with her legs bent in a jack-knife position and with her head partially submerged, although neither the nose nor mouth was under water. Officer Mullen noted a red-brown stain about 4 or 5 inches wide that ran down the back of the tub (from the top of Arlys' head into the water) and the water was bloody. The bathroom walls were clean and the floor was dry. He noticed that the body was rigid, and he made no effort to remove it from the tub. He saw black and blue marks on the deceased's fingers but no wounds on the body. He noted that the bed was unmade but that everything else in the bedroom seemed to be in order. Defendant appeared nervous.

Shortly after Officer Mullen's arrival, Inspectors Flynn and Thompson reached the scene, followed by ambulance driver Hynes and ambulance steward Zielinsky. The latter two, after removing the deceased from the tub to a mat on the bathroom floor, made a brief examination of the body. Zielinsky testified that the body was very stiff and rigid; that there was some bleeding from a matted mass of hair in the back of deceased's head but no wounds were visible; and that her hands were bruised. He removed a sheet from the bed and covered the body. At that time there was a rose-colored bedspread on the unmade bed. The landlady of the

apartment testified that the rose-colored bedspread was hers, but that when the Watsons rented the apartment, Arlys had stated that they had a bedspread of their own and would use the rose-colored one on the divan in the living room; and that as recently as February 9, 1953, she had seen a white bedspread on the bed. Defendant professed not to know what had become of this white bedspread. He stated that some two or three months before, he had burned a hole in it and not wanting the landlady to know of such incident, either he or his wife threw it in the garbage can. It was the theory of the prosecution that defendant had killed his wife in the bedroom; that the white bedspread had become bloodstained; and that defendant disposed of it before he called the police. The white bedspread was not produced.

Two coroner's deputies next arrived at the apartment, and the ambulance men departed. After cleaning up the bathroom, the coroner's men left with the body. Defendant testified that he then notified the military authorities, but neither then nor later did he attempt to communicate with his or his wife's parents. He further testified that Officer Mullen told him that all there was left for him to do was to appear at the coroner's inquest in about six weeks, advised him against remaining in the apartment that night, and left.

About 9:30 that evening the coroner's office reported the death to Inspector Nelder of the homicide detail, and shortly thereafter he and Inspector VanDervoort went to the Watson apartment. The door was locked, and the landlady admitted them. The apartment appeared to be in order, and there was no evidence of breakage or a forced entry. Money was found in the deceased's purse, standing on the bureau, and there was no evidence of robbery. Nelder learned from the Army authorities that defendant was staying at a certain downtown hotel, and the two inspectors went there. Defendant was not in his room but after searching the neighborhood, they found him on the street about 10:30 that evening, and they took him to the Hall of Justice for questioning. The story defendant then told the police and during subsequent interrogation, as well as at the trial, was substantially the same. He admitted that Saturday night, February 14, 1953, he and wife had a disagreement over the fact that she had sent him a Valentine and he had failed to remember her, but he denied that they had a serious argument then or at any other time.

Defendant stated that on the morning of February 15,

1953, while waiting for his wife to prepare breakfast, he went to the store, purchased a newspaper and six cans of beer, which he brought home; that while he was in the bathroom, his wife, without his knowledge, opened one of the cans of beer; that when he came into the kitchen reading the newspaper he attempted, without looking, to open the same can, and cut his finger, causing it to bleed. They ate breakfast about 11 a. m., each having half of two waffles. In the garbage pail in the kitchen there was found a small part of a waffle and other remnants from the breakfast meal as described by defendant, as well as one empty and bloody beer can; the other five cans were found in the refrigerator.

According to defendant, after breakfast he asked his wife if she wanted to take a ride, but she declined stating that she wanted to clean the house in preparation for an expected house guest who was coming the next week. He stated that he then went to make the bed, that as he grasped the bedspread his finger started to bleed again, and he went to get a fresh bandage; that his wife told him that she would take care of the bed; and that he then decided to go out for awhile. He left the apartment about 12:30 p.m., first taking two laundry bags to a nearby laundromat. He then drove to Half Moon Bay, sunned himself on the beach for about half an hour, but left when it became windy. After his arrest, sand was discovered in defendant's shoes and socks. Defendant stated that he then went to Sutro's Baths for a swim, using his own swimming suit. After leaving Sutro's, defendant stated that he started toward home, stopping first about 6 p.m. at a drugstore to buy his wife a heart-shaped box of candy in view of his Valentine Day oversight; next going to a bar where he had a couple of beers, then proceeding to a nearby store to purchase a pint of ice cream, and finally arriving home about 7 p.m. The Watsons' normal dinner hour was about 8 p.m. on Sundays. The box of candy and carton of ice cream were found in the kitchen by the police. Defendant stated that upon entering his apartment he searched for his wife and found her in the bathtub; that he started to lift her, realized that she was dead, desisted, and then telephoned the police. The clothing that defendant stated he was wearing that Sunday—a civilian sports suit—when he undertook to remove his wife from the bathtub was found at the hotel where he later registered that night; and all the clothing, including the jacket, was dry. Defendant stated that he did not get any of his clothing wet at that time.

In attacking defendant's alibi, the prosecution produced the testimony of a cab driver that he had seen defendant sometime between 12 noon and 1 p.m. that Sunday near a certain bar in Daly City. This was on an entirely different route from the one defendant stated that he had taken. Another cab driver and also the wife of the bartender testified that they had seen defendant near or in the bar at about 1:30 p.m. that day. Defendant at all times denied that he had been in Daly City on that Sunday.

It was the theory of the prosecution that defendant had killed his wife in the bedroom before leaving the apartment that Sunday morning; that he then went out to build up an elaborate alibi, and hid or made some disposition of the bloody bedclothes—the previously mentioned white bedspread and a certain yellow blanket which the police learned had been in the apartment but which, like the white bedspread, was never found; that defendant returned home before 7 p.m., cleaned up the apartment to hide the evidence of any struggle, and placed his wife in the bathtub to make the death look like an accident.

The building in which the Watsons occupied an upstairs apartment was so constructed that the tenant below could hear any noises or sounds which might occur above him. The tenant testified that on that Sunday morning between 10, when he arose, and 10:30, when he left, there was no unusual sound from the Watson apartment; nor were there any unusual sounds between 12:30 and 2:30 p.m. or between 4:30 and 6 p.m., when he was again in his apartment. Both this tenant and the landlady in the building testified that on the preceding Saturday, February 14, they heard noises emanating from the Watson apartment, as if furniture was being moved. Upon this premise, the prosecution maintained that the homicide did not occur during the recited hours that the tenant below was in his apartment, and that the Saturday noises were caused by Mrs. Watson's cleaning activities that day, with the result that she had no reason for staying home Sunday to do the already-completed work. A neighbor in adjoining premises testified that sometime between 10:30 a.m. and 12 noon that Sunday morning, she heard three or more unusual thumping noises coming from the Watson apartment. No witness testified to hearing any screams or shouts from the Watson apartment that Sunday morning.

An autopsy on the deceased's body revealed some lacera-

tions on the scalp, distributed in the back and central top area of her head. She had a bruise on her forehead, her neck was bruised as if she had been choked, and she had a small discoloration on her chin. There were multiple bruises over the backs of both hands and wrists, the pathologist characterizing them as defensive contusions caused when she placed her hands over her head to ward off the blows as she was struck from behind. There was no skull fracture but there had been extensive bleeding from the head lacerations. The brain showed multiple areas of contusions and hemorrhages. No water was present in the lungs. There was no evidence of a sexual attack. Apparently, the death was due to multiple traumatic injuries to the head, with contusions and concussion of the brain caused by use of a heavy blunt instrument. The death instrument was never found.

The time factor was a vital element in the case, and the prosecution presented medical testimony bearing on this point. Two medical experts testified as to their examination of the contents of the deceased's stomach, one fixing the death as having occurred one hour, and the other fixing it as one to two hours after the last meal had been eaten. As noted above, defendant stated that he and his wife had breakfast between 10 and 11 that Sunday morning; and he left the apartment about 12:30 p.m. In relation to the setting-in of *rigor mortis,* these medical experts agreed that eight hours after death would be the normal period required for a body of the age and condition of deceased's to reach the state of rigidity which had been described by other witnesses in reciting their observations at the time they went to defendant's apartment about 7:30 p.m. that Sunday. Again this would fix the time of death as about 11:30 a.m., which was before defendant stated that he left the apartment. With regard to whether the deceased's body had long been immersed in water, these medical experts testified that normally skin wrinkling in certain areas occurs about one hour after immersion and remains present for about 22 to 24 hours. There was no skin wrinkling when the body was examined some 17 or 18 hours after removal from the tub.

The civilian clothes that defendant had worn that Sunday were found in the hotel room where he went that evening. Included with this clothing was a pair of socks stuffed into his shoes. There were bloodstains on the soles of the socks—later determined to be both "A" and "O" types of blood; the deceased's was "A" and defendant's was "O." De-

fendant testified that after Officer Mullen left him in the apartment, he finished cleaning the bathroom, including some of the bloody water that fell on the bathroom floor when the body was removed. He did this work in his stocking feet. No other bloodstains were found on defendant's clothing.

On Sunday night, February 15, following defendant's interrogation at the Hall of Justice relative to the homicide, defendant was asked to remove his clothes for examination of his body. At that time it was observed that defendant had some scratches and bruises on his body, apparently recent ones and as to which he was only able to give a partial explanation: a bruise on his knee attributed to rifle range practice the preceding day, Saturday, and the cut on his right index finger resulting from his opening the beer can that Sunday morning; but he could not account for scratches found on his right forearm and left upper chest.

Police criminologists and inspectors made several scientific examinations of the Watson apartment, the first being on February 16. Numerous small bloodstains were found on the east wall of the bedroom (near the bed), which proved to be "O" (defendant's) blood. The bedroom rug near that same side wall appeared to have been rubbed or washed, but was dry; and when sprayed with luminal, that portion of the rug indicated the presence of blood. A luminous reaction was found between the bed and the east wall of the bedroom, going toward the bathroom. No bloodstains were found on the bathroom walls. Examination of the living-room furniture disclosed a few bloodstains on the undersurface of the divan (both "A" and "O" blood). The rose-colored bedspread which was found on the bed (though presumably it was originally on the divan according to the prosecution's evidence as above noted) also contained bloodstains (in the main "O" type but also some "A").

On the circumstantial evidence which has been summarized, the jury returned a verdict of second degree murder. Defendant does not contend that the evidence is insufficient to support the conviction, but he relies for reversal upon four assignments of error.

First to be considered is defendant's complaint of the restriction of the defense's cross-examination of Police Officer Mullen. ■ It is generally recognized that the scope of cross-examination should be confined to matters which have been elicited from the witness on direct examination. (Code Civ. Proc., § 2048.) The prosecution's objections in the main

were sustained on this ground. The record shows that apparently some seven public officials examined the deceased's body in the apartment that Sunday evening between 7:15 and 7:45 p.m.: Officer Mullen; the two ambulance men, Hynes and Zielinsky; the two police inspectors, Flynn and Thompson; and the two coroner's men. Officer Mullen was the first police officer to arrive on the scene, and he remained there while these others came and went. Of this group, the prosecution only called the two ambulance men, in addition to Officer Mullen, as witnesses. The defense in the main was attempting to get in the record, through cross-examination of Officer Mullen, conversations between Officer Mullen and the public officials above mentioned who did not testify at the trial; also various comments and remarks that Officer Mullen may have heard these persons make while they were in the apartment.

The chief object of cross-examination is to test the credibility, knowledge, and recollection of the witness. It should be given wide latitude, particularly in cases involving "a witness against a defendant in a criminal prosecution." (27 Cal.Jur. § 76, p. 97; *People* v. *Whitehead*, 113 Cal.App. 2d 43, 48 [247 P.2d 717].) Thus, it is undisputed that where a witness testifies as to part of a conversation on direct examination, then on cross-examination, the whole of the conversation may be elicited, at least so far as it is germane. Moreover, section 1854 of the Code of Civil Procedure provides: "When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation or writing, which is necessary to make it understood, may also be given in evidence." This section was applied in *People* v. *Whitehead, supra,* in reversing a murder conviction because of improper limitations imposed in the cross-examination of a prosecution witness. There the court prohibited cross-examination of the witness on certain conversation between the deceased and defendant at the time of the killing, as to which conversation "no testimony whatsoever was introduced on direct examination." (P. 49.) This ruling was held to be erroneous upon the basis of the "verbal act theory," that "physical acts testified to cannot be arbitrarily separated from the verbal acts accompanying them and made at the same time and place" (p. 49), and so "when testimony has

been introduced relative to an occurrence all parts of that occurrence, verbal as well as physical, are properly within the scope of the cross-examiner's probe.'' (Pp. 49-50.)

But the Whitehead case involved a typical situation for application of the rule in that the object of the cross-examination was to bring out the conversation between the deceased and defendant accompanying the commission of the killing. Here, the situation differs in that the conversations, comments and remarks which the defense sought to elicit from Officer Mullen on cross-examination, though they formed no part of his testimony on direct examination, concerned conversations of third persons occurring after, rather than accompanying, the happening of the crime. ██ Simply because Officer Mullen testified on direct examination about certain phases of his own inspection of the Watson apartment, his observations of the deceased's body, and his conversation with defendant, does not mean that the door was thereby opened to an unrestricted line of cross-examination upon anything that he may have heard from third persons while he was in the apartment. These remarks and comments, being in the nature of unsworn statements made by various third persons who had not been called as witnesses, and who had merely inspected the premises and expressed their personal views or opinions, were inadmissible hearsay and not proper cross-examination.

While defendant makes some general complaint concerning the alleged curtailment of the cross-examination of Officer Mullen and other prosecution witnesses, the record does not sustain his claim. On the contrary, it appears that the trial court was very liberal in the allowance of the defense's cross-examination of Officer Mullen, for his direct examination covered but 14 pages of the transcript while his cross-examination covered 80 pages. There were other instances showing the liberality of the trial court in allowing cross-examination of prosecution witnesses: Inspector Nelder's direct examination covered 86 pages, his cross-examination 169 pages; the autopsy surgeon's direct examination covered 14 pages, his cross-examination 163 pages; and another pathologist's direct examination covered 18 pages ,his cross-examination 185 pages. It does not appear that the trial court misapplied the principles governing the proper limitation of cross-examination, but rather that it followed a liberal policy in its rulings.

Defendant next contends that the trial court erred in giving an instruction that neither the prosecution nor the

defense was required to call as witnesses "all persons who are shown to have been present at any of the events involved in the evidence." He claims that the prosecution should have called the two police inspectors and the two coroner's men to testify as to their observations concerning the degree of *rigor mortis* found in the deceased's body at the time of their arrival at the Watson apartment that Sunday evening between 7:15 and 7:45 p. m. He makes no comment, however, as to his own failure to call these witnesses if he thought their testimony would have supported his case.

Defendant takes the position that since these witnesses were not called by the prosecution, it should be presumed that their testimony would not have been corroborative of the account of prosecution witnesses Mullen and the two ambulance men, Hynes and Zielinsky, but rather would have been unfavorable to the prosecution's theory. For this proposition, he cites *People* v. *Beal*, 116 Cal.App.2d 475 [254 P.2d 100], where the prosecuting witness in a rape charge failed to produce her examining physician, and there was no independent proof of the alleged offense other than her own testimony, which varied in several material particulars; and *Julson* v. *Julson*, 110 Cal.App.2d 797 [243 P.2d 558], where in a divorce action, about ten persons of a group witnessed a certain episode, no one of them was called as a witness, no explanation was given therefor despite the need for corroborating evidence, and under such circumstances the court was declared "bound to presume . . . that their testimony would be unfavorable, and was for that reason suppressed." (P. 801.) ▮ But the present situation is not comparable to the cited cases, for the prosecution did call several witnesses as above mentioned to testify to the degree of *rigor mortis* present in the body when they saw it that Sunday evening. The instruction that neither side was required to produce all witnesses who might be able to testify to that particular fact has a practical premise, for otherwise there would be a repetitious recital of testimony which would prolong the trial beyond reasonable limits. Under the circumstances, it would seem that defendant's remedy would have been to have called the witnesses on his own behalf if he believed their testimony would have aided his cause. (See *People* v. *Powell*, 83 Cal.App. 62, 67-68 [256 P. 561].)

The next question concerns the court's instructions on circumstantial evidence. ▮ As above stated, this was

wholly a circumstantial evidence case, and the court properly gave several instructions on the subject: That where the evidence is susceptible of two constructions, it is the jury's duty to adopt that construction which points to defendant's innocence (CALJIC No. 26); and where circumstantial evidence is relied upon as proof of guilt to justify a conviction, the facts or circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion (CALJIC No. 27). (*People* v. *Bender*, 27 Cal.2d 164, 175 [163 P.2d 8]; *People* v. *Koenig*, 29 Cal.2d 87, 91-93 [173 P.2d 1]; *People* v. *Zerillo*, 36 Cal. 2d 222, 233 [223 P.2d 223].) The following related CALJIC instructions were also given: No. 21 (presumption of innocence, reasonable doubt, burden of proof); No. 24 (direct and circumstantial evidence equally entitled to consideration); and No. 25 (direct and indirect evidence—code definitions). But the court refused to instruct in language substantially embodying CALJIC No. 28: That "When the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt."

Defendant argues that it was error for the court to refuse to give a requested instruction in language substantially embodying CALJIC No. 28. *People* v. *Bender, supra, People* v. *Koenig, supra,* and *People* v. *Zerillo, supra,* were concerned primarily with the court's error in failing to give CALJIC No. 27, although in the Koenig case the refused instruction was extended to include, in part, the principle of CALJIC No. 28. In the Zerillo case the error was held reversible error but not so in the Bender and Koenig cases.

In the District Courts of Appeal the adequacy of the instructions on the principles governing circumstantial evidence cases has been variously handled. Depending on the particular record, the court's failure to give more complete instructions on the subject was held cause for reversal in *People* v. *Hatchett,* 63 Cal.App.2d 144, 152-156 [146 P.2d 469]; *People* v. *Rayol,* 65 Cal.App.2d 462, 465-466 [150 P.2d 812], and *People* v. *Tholke,* 75 Cal.App.2d 857, 860-861 [171 P.2d 904]; but not in *People* v. *Webster,* 79 Cal.App.2d 321, 327-329 [179 P.2d 633], *People* v. *Candiotto,* 128 Cal.App.2d 347, 356-358 [275 P.2d 500], and *People* v. *Perez,* 128 Cal.

App.2d 750, 758-759 [276 P.2d 72]. Where the error in the instructions has required a reversal, the essential consideration was in the failure to give a proper statement of the principle that circumstantial evidence must be inconsistent with any other rational hypothesis than that of guilt (CALJIC No. 27). CALJIC No. 28 was held applicable in the determination of a circumstantial evidence case in *People* v. *Webster, supra, People* v. *Garnier,* 95 Cal.App.2d 489, 500 [213 P.2d 111] ; *People* v. *Candiotto, supra,* and *People* v. *Perez, supra;* but was deemed "too liberal" in *People* v. *Mansour,* 103 Cal.App.2d 592, 598 [230 P.2d 52]. The latter view was based on the premise that the law only requires that defendant's guilt be proved beyond a reasonable doubt but not that each fact in the chain of circumstances—in the sense of "each incident or event inculpating the defendant" —be so proved, citing *People* v. *Nunn,* 65 Cal.App.2d 188, 195 [150 P.2d 476], and *People* v. *Klinkenberg,* 90 Cal.App. 2d 608, 632 [204 P.2d 47, 613]. Moreover the Mansour case rested on circumstantial evidence, while in the Nunn and Klinkenberg cases the evidence was not wholly circumstantial but was largely direct; and "a court is not required to instruct upon the rules of law applicable to circumstantial evidence which is incidental to and corroborative of direct evidence." (*People* v. *Jerman,* 29 Cal.2d 189, 197 [173 P.2d 805] ; see also *People* v. *Zerillo, supra,* 36 Cal.2d 222, 233 ; *People* v. *Harmon,* 89 Cal.App.2d 55, 60 [200 P.2d 32]. *People* v. *Kross,* 112 Cal.App.2d 602, 615 [247 P.2d 44], and *People* v. *Eddy,* 123 Cal.App.2d 826, 835 [268 P.2d 47], follow *People* v. *Mansour, supra,* 103 Cal.App.2d 592, 598.)

Properly interpreted, CALJIC No. 28 applies the doctrine of reasonable doubt not to proof of miscellaneous collateral or incidental facts, but only to proof of "each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt." Although the import of the opening phrase in CALJIC No. 28 may be somewhat confusing because of the reference to its applicability when the People's case rests "chiefly" on circumstantial evidence, it is clearly applicable to cases such as the present one, which rests entirely upon circumstantial evidence. Accordingly, the trial court erred in refusing to give defendant's instruction which substantially embodied CALJIC No. 28. (See cases collected: Stout on "*Appellate Review of Criminal Convictions on Appeal,*" 43 Cal.L.Rev. 381, 446-447.)

However, the jury here was correctly instructed on

the doctrine of reasonable doubt (CALJIC No. 21; Penal Code, §§ 1096, 1096a), the law applicable where evidence is susceptible of different constructions (CALJIC No. 26), the principle that circumstantial evidence of defendant's guilt must be inconsistent with any other rational hypothesis (CALJIC No. 27), and other related matters as above noted. Under these circumstances, it does not appear here that the court's failure to give a further instruction substantially in the language of CALJIC No. 28 has "resulted in a miscarriage of justice" within the meaning of the constitutional provision as hereinafter discussed. (Const., art. VI, § 4½.)

Defendant finally contends that the court erred in permitting the prosecution, over objection, to develop certain alleged collateral matters through his cross-examination, and which he claims could have had no purpose except to discredit and degrade him.

The first point to be considered is the propriety of the prosecution's questioning of defendant on the matter of his attending a radio-television school. After eliciting on defendant's cross-examination the fact of defendant's attendance, the prosecution continued the questioning by asking defendant as to the courses such instruction covered. Defendant's objection that such inquiry was incompetent, irrelevant and immaterial, as well as beyond the scope of his direct examination, was overruled; and his answers indicated that his studies there consisted of script-writing, voice projection and related matters. While the relevancy of such inquiry might be open to reasonable dispute, still it is generally recognized that where "a defendant takes the stand and makes a general denial of the crime with which he is charged, the permissible scope of cross-examination is very wide." (*People v. Zerillo, supra,* 36 Cal.2d 222, 228.) Furthermore, on direct examination, defendant had been questioned about his background, and specifically with regard to his education. In response to such interrogation he related his graduation from high school, his one semester of college, his training with the Maritime Service. Under these circumstances the trial court did not err in allowing the prosecution's inquiry as to defendant's attendance at radio-television classes.

Defendant's second point of objection concerns his cross-examination as to his height and related facts. On direct examination, defendant stated that he was 6 feet 6 inches tall. On cross-examination, the prosecution asked defendant about certain marks on one of the door frames in his apart-

ment, and defendant admitted that they were measurements of his height at various intervals. Then over objection, the prosecution was permitted to show that defendant had been attending gymnasium classes, the contention being that defendant did so to stretch his height beyond the 6 feet 6 inch limit fixed by the Army, and so he could be discharged from further Army service. The prosecution then made an offer of proof—that defendant had written a letter dated February 6, 1953, addressed to the Army authorities to the effect that he was above the maximum height of 78 inches acceptable to the Army and should be permitted to get out of the Army. The prosecution argued that defendant was wearing his Army uniform in court to gain sympathy and respect for his patriotic service, and the proffered evidence would serve to rebut this effect. Counsel for defendant responded that the proposed line of questioning was not only beyond the scope of the direct examination, but that defendant's motive in wearing the uniform was entirely collateral, for admittedly defendant was still in the Army and was entitled, in fact required, to wear the uniform. After considerable discussion with counsel, the trial court finally ruled that such evidence was admissible "for the limited purpose only . . . of permitting the jury to determine in the last analysis the weight that it is to give to this line of testimony." The prosecution then proceeded to cross-examine defendant about his gymnasium exercises and about his letter to the Army authorities. He stated that in January, 1953, he attended these classes to improve his posture, not to stretch his height. He further stated that when he learned of the Army regulations as to height, he wrote the letter in question, not for the purpose of getting out of the Army earlier, for his discharge was due in March, 1953, and the letter would not be acted upon by that time, but he just wanted to see what would happen and to throw a "bombshell" into the Army administration.

Section 2065 of the Code of Civil Procedure, after providing what answers a witness must give, states "but he need not give an answer which will have a tendency to subject him to punishment for a felony; nor need he give an answer which will have a direct tendency to degrade his character, unless it be to the very fact in issue. . . ." Section 2066 of the same code provides: "It is the right of a witness to be protected from irrelevant, improper or insulting questions, and . . . to be examined only as to matters legal

and pertinent to the issue.'' ██ The challenged but admitted evidence was undoubtedly collateral and irrelevant to any issue in the case. The casting of aspersions on defendant's reasons for wearing an Army uniform that he was entitled to wear, and offering evidence to show an attempt to get a discharge from the Army had no bearing on his motive or credibility in relation to the crime charged. Such questioning on collateral matters and having apparently no other purpose but to degrade defendant has been held reversible error under certain circumstances. (*People* v. *Fleming*, 166 Cal. 357, 383 [136 P. 291, Ann.Cas. 1915B 881]; *People* v. *Rodriguez*, 134 Cal. 140, 142 [66 P. 174]; *People* v. *Adams*, 76 Cal.App. 178, 184 [244 P. 106].) The question now presented is whether the error here requires a reversal in view of the provisions of article VI, section 4½ of the Constitution.

This section, first adopted in 1911 with reference only to criminal cases but amended in 1914 so as to apply as well to civil cases, now reads: ''*No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.*'' (Emphasis added.) While it had long been provided in our statutory law that judgments would not be reversed because of technical errors or defects which did not affect the substantial rights of the defendant (Pen. Code, §§ 1258, 1404), the courts nevertheless in reviewing convictions in criminal cases had generally followed the rule that prejudice would be presumed from error and upon that basis the defendant was ''entitled to a reversal of the judgment.'' (*People* v. *Williams*, 18 Cal. 187, 194; see also *People* v. *Murphy*, 47 Cal. 103, 106; *People* v. *Stanley*, 47 Cal. 113, 119 [17 Am.Rep. 401]; *People* v. *Furtado*, 57 Cal. 345, 347; *People* v. *Sansome*, 84 Cal. 449, 451 [24 P. 143]; *People* v. *Moore*, 103 Cal. 508, 511 [37 P. 510]; *People* v. *Richards*, 136 Cal. 127, 128 [68 P. 477].) The constitutional amendment added a new concept calling for a determination by the court that the alleged error resulted in ''a miscarriage of justice.'' To this end the appellate court was required to review the evidence so as to form an ''opinion'' as to whether the assigned errors

had affected the outcome of the case resulting in "a miscarriage of justice."

Shortly after the adoption of the amendment, its meaning and scope were considered in *People* v. *O'Bryan* (1913), 165 Cal. 55 [130 P. 1042]. That case involved the infringement of the defendant's constitutional right not to be compelled to testify against himself in a criminal action. (Cal. Const., art. I, § 13.) Conceding the error, there remained the question of whether the character and effect of that error were such as to require a reversal under the circumstances, having "due regard to the terms of section 4½ of article VI." (P. 63.) In an exhaustive discussion of the problem, the following principles were declared: That the section abrogated the former rule that prejudice is presumed from error, and allowed the reviewing court to consider the evidence to determine whether the error did in fact prejudice the defendant; that the distinction between reversible and nonreversible error does not rest upon the distinction between error relating to constitutional rights as contrasted with other rights, but that the section applies to both; that certain fundamental rights, however, are guaranteed to the defendant upon which he can insist regardless of the state of the evidence, such as the right to a jury trial and the right to protection under the plea of once in jeopardy, but that not every invasion of a constitutional right necessarily requires a reversal; that generally, error involving the infringement of a constitutional right, like any other error, requires a further determination whether the defendant has been prejudiced, and the final test is the "opinion" of the reviewing court, in the sense of its belief or conviction, as to the effect of the error; and that ordinarily where the result appears just, and it further appears that such result would have been reached if the error had not been committed, a reversal will not be ordered. Upon this basis, the error committed in the O'Bryan case was held not to be cause for reversal. (See also *People* v. *Mayfield* (1927), 85 Cal.App. 77 [259 P. 75].)

The controlling consideration in applying the section is whether the error has resulted in a "miscarriage of justice." In determining the meaning of this phrase, the reviewing courts have stated the test to be applied in varying language. Emphasis in the main, however, has been placed on the constitutional requirements of a fair trial and due process, which emphasis is found in decisions resulting in reversals (*People* v. *Sarazzawski*, 27 Cal.2d 7, 11 [161 P.2d

934] ; *People* v. *Mahoney,* 201 Cal. 618, 627 [258 P. 607] ; *People* v. *Hall,* 199 Cal. 451, 458 [249 P. 859] ; *People* v. *Carmichael,* 198 Cal. 534, 547 [246 P. 62]) as well as in decisions resulting in affirmances (*People* v. *Kelso,* 25 Cal.2d 848, 852-853 [155 P.2d 819] ; *People* v. *Gonzales,* 24 Cal.2d 870, 877 [151 P.2d 251] ; *People* v. *Watts,* 198 Cal. 776, 792-793 [247 P. 884]). In *People* v. *Watts, supra,* at page 793, it was said that ''it must affirmatively appear to the satisfaction of this court . . . that the accused may well have been substantially injured by the error of which he complains''; and in *People* v. *Kelso, supra,* at page 853, it was said that there should be no reversal where ''it appears that a different verdict would not otherwise have been probable.''

Somewhat different is the language used where the reviewing court has expressed doubt as to whether the error had affected the verdict. Such view has been stated in the form of a double negative, with a reversal required if the court is of the opinion that ''a different verdict would not have been improbable had the error not occurred'' (*People* v. *Putnam,* 20 Cal.2d 885, 892 [129 P.2d 367]) or ''if it cannot be said that, in the absence of the error complained of, a different verdict would have been improbable, the erroneous ruling constitutes a miscarriage of justice within the meaning of the constitutional provision. (*People* v. *Hamilton,* 33 Cal.2d 45, 51 [198 P.2d 873] ; *People* v. *Rogers,* 22 Cal.2d 787, 807 [141 P.2d 722] ; *People* v. *Putnam,* 20 Cal.2d 885, 892 [129 P.2d 367].)'' (*People* v. *Newson,* 37 Cal.2d 34, 45 [230 P.2d 618] ; see also *People* v. *Carnine,* 41 Cal.2d 384, 392 [260 P.2d 16] ; and cases collected in ''Appellate Review of Criminal Convictions on Appeal,'' 43 Cal.L.Rev. 381.)

Giving due consideration to the varying language heretofore employed in relating the constitutional amendment to the particular situations involved, it appears that the test generally applicable may be stated as follows : That a ''miscarriage of justice'' should be declared only when the court, ''after an examination of the entire cause, including the evidence,'' is of the ''opinion'' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. Phrasing the test in this language avoids any complexity which may be said to result from the language employed in the double negative approach, and such phrasing seems to coincide with the affirmative language used in the constitutional provision.

We are of the view, however, that the test as above stated does not constitute a departure from the tests heretofore applied, but is merely a crystallization in affirmative form of the guiding principle which the courts have sought to enunciate in phrasing the test in other language. For example, the application of the double negative approach, as stated in some of the recent decisions, presupposes that a reversal will result only when there exists, in the opinion of the court, at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result. But the fact that there exists at least such an equal balance of reasonable probabilities necessarily means that the court is of the opinion "that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." Thus, it appears that the tests, as variously stated, are not fundamentally different but, on the contrary, are essentially the same. Nevertheless, the test, as stated in any of the several ways, must necessarily be based upon reasonable probabilities rather than upon mere possibilities; otherwise the entire purpose of the constitutional provision would be defeated.

Applying the test as above stated to the record before us, we are of the opinion that it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error in permitting the cross-examination of defendant as to his gymnasium exercises and his letter to the Army authorities. He gave an explanation of both acts designed to remove any derogatory effect that otherwise might have resulted from the prosecution's inquiry. It does not appear reasonably probable that the jury was influenced by such evidence to defendant's prejudice, or that the admission of such evidence affected the verdict. Similarly, we are of the opinion, as heretofore indicated, that it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error in refusing to give the additional instruction relating to circumstantial evidence. The uncontradicted evidence concerning the condition of the body of the deceased clearly showed that the deceased met her death during the hours that defendant admittedly was in the apartment; and this evidence, together with other evidence, unerringly pointed to defendant's guilt. In short, from an "examination of the

entire cause, including the evidence,'' it is our ''opinion'' that ''the error complained of has'' not ''resulted in a miscarriage of justice.''

The judgment is affirmed.

Gibson, C. J., Traynor, J., and McComb, J., concurred.

Shenk, J., concurred in the judgment.

SCHAUER, J., Dissenting.—In the majority opinion it is recognized that ''It is the *right* of a *witness* [italics added] to be protected from irrelevant, improper or insulting questions, and . . . to be examined only as to matters legal and pertinent to the issue.'' (See Code Civ. Proc., §§ 2065, 2066.) When the ''witness'' is also the defendant on trial for his life or liberty, failure to accord him that specifically declared right takes on vastly greater import than where the victim of the misconduct is affected only as a witness.

The majority opinion also recognizes that ''The challenged but admitted evidence was undoubtedly collateral and irrelevant to any issue in the case. The casting of aspersions on defendant's reasons for wearing an Army uniform that he was entitled [apparently required] to wear, and offering evidence to show an attempt to get a discharge from the Army had no bearing on his motive or credibility in relation to the crime charged.'' In other words, it is conceded that the object and effect of asking the improper questions was to prejudice the defendant in the minds of the jurors.

Technical proof of guilt and effective persuasion of guilt may be quite different things. For proof of guilt to sustain the verdict on appellate review the prosecution relies upon circumstantial evidence which, while not wholly insufficient as a matter of law, is far from being overwhelming or even satisfyingly convincing as a matter of substance. Many of the suspicious circumstances are susceptible of innocent construction. The finding of guilt rests heavily upon inferences drawn in some respects from objective facts and as to other elements from opinion evidence. Certainly, resolution of the conflicting inferences and of the ultimate fact is for the jury, but when the scales of proof are so delicately balanced it should be resolved by a jury which has heard relevant evidence and which has not been prejudiced *and thereby persuaded* by irrelevant matters. It seems rather clear to me that the natural result of the conceded error was a mis-

carriage of justice—a verdict of guilty materially aided by other than relevant evidence and, hence, obtained by means other than those delimited by the standards of a fair trial.

For a more complete narration of the evidence, elaboration of the general unfair conduct of the trial, and a correct application of the pertinent rules of law, reference is made to the opinion prepared for the District Court of Appeal by Presiding Justice Peters and concurred in by Justices Bray and Fred B. Wood, Jr., reported at (Cal.App.) 288 P.2d 184.

For the reasons therein and hereinabove indicated I conclude that there has been a miscarriage of justice and would reverse and remand for a new trial.

CARTER, J.—I dissent.

In my opinion this case was correctly decided by the District Court of Appeal, First Appellate District, Division One, in an able and exhaustive opinion prepared by Mr. Presiding Justice Peters and concurred in by Justices Bray and Wood. (Cal.App., 288 P.2d 184.) After an exhaustive review of the evidence and an able and comprehensive discussion of the contentions of the respective parties, that opinion concludes: "We conclude, after reading the transcript, that, because we cannot say with conviction that, in the absence of the errors complained of, a different verdict would have been improbable, the judgment must be and is reversed, and a new trial ordered."

The majority of this court concedes, as it must, that numerous errors were committed by the trial court during the trial of this case, but concludes that such errors were not prejudicial to defendant and did not result in a miscarriage of justice, as that term is used in section 4½ of article VI of the Constitution of California.

I have heretofore had occasion to discuss the applicability of this constitutional provision to both criminal and civil cases (see dissenting opinions, *People* v. *Tarantino*, 45 Cal. 2d 590, 604 [290 P.2d 505], and *Buckley* v. *Chadwick*, 45 Cal.2d 183, 203, 208 [288 P.2d 12, 289 P.2d 242]), and I will not here take the time to review the authorities or discuss their applicability to the case at bar. I cannot refrain from stating that I positively do not agree with the holding of the majority here "that generally, error involving the infringement of a constitutional right, like any other error,

requires a further determination whether the defendant has been prejudiced, and the final test is the 'opinion' of the reviewing court, in the sense of its belief or conviction, as to the effect of the error; and that ordinarily where the result appears just, and it further appears that such result would have been reached if the error had not been committed, a reversal will not be ordered.'' On the contrary, it is my positive and unqualified opinion that it was not the intention of the framers of section 4½ of article VI of our Constitution or of the people who voted for the adoption of said provision, that said section could be invoked for the purpose of affirming a judgment in either a criminal or civil case where the appealing party had been denied a constitutional or statutory right, because such a holding would have the effect of reading into said provision the repeal of all constitutional provisions which were adopted for the purpose of establishing a system for the administration of justice which the courts of this state are required to follow if we are to have a government of law and not of men. In other words, it is my concept that before a conviction of a criminal offense may be sustained, it is necessary that the constitutional and statutory provisions which outline the procedure to be followed, must be complied with, and it cannot be said that guilt has been established in accordance with law if the accused has been denied any of the rights guaranteed to him by the Constitution and statutes of this state.

It is perfectly obvious to me that the concept of the framers of section 4½ of article VI of our Constitution was that technical errors in instructions to the jury or in the admission or rejection of evidence or errors in pleading or procedure which could not affect the result in a case should not be relied upon as a ground for the reversal of a judgment. In fact this is what the plain language of the section states, and I am in full accord with this concept. However, the section has not been so construed by this court. In fact, the section has been invoked to affirm judgments of conviction where the errors complained of clearly and obviously affected the substantial rights of the defendant (see *People* v. *Tarantino*, 45 Cal.2d 590, 604 [290 P.2d 505]). To my mind it is perfectly obvious that this salutary provision of our Constitution has been applied in recent years in such a manner that any judgment of conviction may be upheld regardless of the grievous errors which may have been committed by the trial court because it was the view of four members of this court

that the conviction should be upheld regardless of the effect of such errors; in other words, it is a matter of the philosophy of the individual members of this court rather than the interpretation of the constitutional provision here involved.

A reading of the majority opinion here demonstrates that whenever the majority desires to invoke section 4½ of article VI for the purpose of affirming a judgment of conviction, it simply resorts to double-talk and finally arrives at the conclusion that the judgment should be affirmed. This is precisely what has happened in the case at bar.

For the reasons stated in the opinion of the District Court of Appeal hereinbefore cited, I would reverse the judgment and grant defendant a new trial.

Appellant's petition for a rehearing was denied August 1, 1956. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.