Filed 5/6/22  P. v. Meza CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALICIA ROSINA MEZA,<br><br>    Defendant and Appellant. | F081612<br><br>(Super. Ct. No. SC063320A)<br><br>**OPINION** |

<u>**THE COURT**</u>[*]

APPEAL from an order of the Superior Court of Kern County.  Michael G. Bush, Judge.

Allan E. Junker, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Poochigian, Acting P. J., Franson, J. and DeSantos, J.

## INTRODUCTION

In 1996, a jury convicted petitioner Alicia Rosina Meza of the first degree murder of Isidro Soto Cardinas (Pen. Code,[1] § 187, subd. (a), count 1).[2]  On count 1, the jury found true the special circumstance that petitioner committed the murder while engaged in the commission or attempted commission of robbery.  (§ 190.2, former subd. (a)(17)(i)).  For this offense, the trial court sentenced petitioner to a term of life in prison without the possibility of parole.  (*People v. Meza* (Oct. 30, 1997, F025822) [nonpub. opn.] (*Meza*).)

In 2019, petitioner filed a petition for resentencing on her murder conviction pursuant to section 1170.95.  The trial court summarily denied the petition without providing a statement of reasons.

In this appeal from the trial court's order, her counsel has filed a brief that summarizes the facts of the case, raises no issues, and asks this court to independently review the record.  (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).)  Petitioner did not file a supplemental brief.  We affirm the trial court's order denying resentencing relief pursuant to section 1170.95.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are from our unpublished opinion in petitioner's direct appeal.[3]

"On June 9, 1995, Alfredo S[.][4] and Isidro Cardinas went to the Plaza Motel on Union Avenue in Bakersfield, where they rented room 59.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     Petitioner was convicted of additional offenses and enhancements, as described below.

[3]     We provide these facts for background purposes only because they were referred to by petitioner's counsel in her opening brief.  However, we do not rely on these facts in resolving the issues presented in this appeal.  (See § 1170.95, subd. (d)(3).)

[4]     Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names.  No disrespect is intended.

According to [Alfredo], their purpose in going to the motel was to see if Angel Garcia was there, so they could return a car to him. [Alfredo] went to the store to buy beer. When he returned to the motel, [petitioner] and another woman were there with Cardinas. At some point, [Alfredo] left with [petitioner] to pick up her friend. [Fn. omitted.] During the course of their time together, [petitioner] showed [Alfredo] a tattoo on her front area that read 'Meza.'

"At some point, [Alfredo] exited Angel Garcia's room and was waiting for Cardinas to come out so they could leave. While he was standing there, [petitioner] took him to the front of the motel for some reason. She was acting very friendly toward him. There were a number of African-American men around the motel. At the front of the motel, [Alfredo] was approached by an African-American woman who was holding a barbecue fork. This woman exchanged looks with [petitioner]. [Fn. omitted.] The African-American woman said, '[W]e could take this guy,' or '[T]his one we can beat up.' [Petitioner] put her arm around [Alfredo] and held onto the neck area of his shirt. When he broke loose, the African-American men jumped on top of him and hit him. He had $80, which he threw on the ground. He did not see who picked it up as he was being beaten.

"Cardinas came out of the hotel to help. He stood between [Alfredo] and the lady with the fork and asked what was the problem. At this point, [petitioner] was behind the lady with the fork. When the lady tried to prick Cardinas with the fork, he knocked it out of her hand. [Alfredo] threw it toward the roof. [Petitioner] then pulled out a gun and was hollering at them. Cardinas ran toward the car. [Alfredo] was again being beaten by one of the men. He saw [petitioner] run behind Cardinas, pointing the gun, and then he heard a gunshot. Cardinas continued to run. Afterward, [Alfredo] saw that Cardinas had fallen by Cardinas's car.

"Angel Garcia's boss, Fermin G[.] (no relation), visited Angel Garcia on June 9. When Fermin [] arrived, Cardinas was in Angel Garcia's motel room. [Alfredo] was right outside the room, alone. Fermin [] remained for five to ten minutes, then went to his car. As he was talking on his cellular telephone, he heard what sounded like a gunshot. He turned to look and saw Cardinas crawling between Fermin['s] [] car and Cardinas's car. Cardinas tried to open the driver's door of his car, then Fermin[]'s attention was diverted when a woman stepped in front of him. The woman — [petitioner] — had a tattoo on her left shoulder that said 'Meza.' She also had a gun.

3.

"[Petitioner] put the gun in Fermin['s] [] stomach and told him to drop the telephone. [Petitioner] demanded money and grabbed Fermin['s] [] necklace. He gave her the money that was in his pocket. She then asked for his wallet. He handed it over; she passed it to an African-American man who was close by her side. He removed the money, then dropped the wallet. [Petitioner] ran away. There were other people with her.

"Later that night, the police showed [Alfredo] and Fermin [] a photographic lineup. Both identified [petitioner] as the woman who had the gun.

"Isidro Cardinas died of a gunshot wound to the back. Assuming Cardinas was upright at the time he was shot, the track of the bullet was essentially parallel with the ground. The bullet entered just below the left shoulder bone. With this type of wound, Cardinas could have moved for a short time after he was shot, but death would have occurred within about three minutes. Toxicology tests were positive for cocaine and alcohol.

"On June 18, [petitioner] was arrested in Santa Cruz. After [petitioner] was advised of her constitutional rights, she gave a statement to Detective Vincent. [Petitioner] initially stated that she was present, but did not fire a gun. She identified 'Dede' as the woman with the barbecue fork who had robbed Cardinas and his friend. In another version of events, [petitioner] said she pulled the gun out and it accidentally discharged and hit the victim and herself as well. She showed Vincent a mark on her hand where she said she had shot herself. It did not appear to Vincent to be a gunshot wound. Still another time, she said she pulled the gun out and shot the victim. She had no reason. [Petitioner] said Fermin [] may have thought she was the one robbing him, but she was just standing there with the gun and an African-American male was doing the robbery. She had nothing to do with the robbery. [Petitioner] identified the robber as 'Regulate,' a man she said was the brother of Steven Thomas, one of the persons with her when she was arrested. She said she gave the gun to Victorio Atherton, who had also been arrested with [petitioner], and told him to get rid of it. [Petitioner] said the gun was a .25 automatic. [Fn. omitted.] [Petitioner] said she did not know the other African-American men who were in the area at the time this occurred. [Petitioner] said she ran because she was scared. She knew she had shot someone and he was dead.

"[Petitioner] testified at trial that on the night in question, she resided at LaMirage Motel with her two boys, then ages ten months and two years. On that evening, she left the children with Victorio Atherton while she went to a mini-mart across the street from the Plaza Motel. As

4.

she was walking to the store, [Alfredo] approached and asked if she was working the streets. She told him no. She then drank some beer and ingested cocaine with him and his companion. [Alfredo] said he would give her $20 to find him some pretty girls, if she knew any. [Fn. omitted.] She told him she did. This took place in the parking lot. [Petitioner] never entered a motel room. However, she did walk to the store with [Alfredo] to get beer.

"At some point, [Alfredo] and [petitioner] got into a car to go look for girls for [Alfredo]. They drove around the block, then parked at the store across from the motel. [Alfredo] started touching [petitioner], so she left him at the store and walked back to the motel to tell Cardinas. Cardinas was talking to some African-American females. When [petitioner] told him about [Alfredo], he persuaded her to stay and drink a little longer. [Alfredo] arrived and they all began drinking again. [Alfredo] had some condoms when he returned.

"[Alfredo] left on foot and returned with a girl. He rented room 59. Cardinas never entered the room. [Petitioner] remained talking to Cardinas by a truck. There were African-American men in and out of a room nearby. Dede and another African-American female were also by the truck. At this point, [Alfredo] was in the motel room.

"By the time [Alfredo] returned, only [petitioner], Cardinas, and Dede remained by the truck. As [Alfredo] approached, Regulate (the brother of Steven Thomas, [petitioner]'s boyfriend at the time) yelled at [petitioner] to get back to the motel with the kids. [Petitioner] replied that she would be there when she finished talking to Cardinas. [Alfredo] then yelled a racial slur to Regulate and told him to leave [petitioner] alone. Three or four African-American men were there with Regulate.

"[Alfredo] started walking toward Regulate. [Petitioner] put her arm around [Alfredo] and told him to leave the men alone and not start trouble. Dede, Regulate's girlfriend, came out of the front of the motel with a fork. [Petitioner] did not speak to her, nor did she know if [Alfredo] had any money. [Alfredo] and [petitioner] started backing up, then the men started running at and beating up [Alfredo]. [Alfredo] was not robbed.

"[Petitioner] went back to tell Cardinas, who laughed and walked toward the area. When he saw how many assailants there were, he started backing away. Cardinas was going to his car for something. He went back to his motel room to get his car keys. [Petitioner] did not know what to do, as there was a crowd of people. She spoke with Dede, who no longer had the fork. [Petitioner] did not see what happened to it. [Alfredo] started

5.

running toward room 46, but the men caught him and started beating him again. Cardinas was standing at the doorway of the room. He was trying to tell someone to call the police.

"[Petitioner] saw [Alfredo] being kicked, and she got ready to leave. Then Regulate came up and asked her for the .25 caliber gun she had in her shorts. She carried the weapon, which she had obtained from her boyfriend, because she had been 'jumped' by five girls three days earlier. When Regulate asked her for it, she pulled it out of her shorts. She did this so as to hide the gun as she gave it to him, because the motel manager was out there saying he was going to call the police. She was giving the gun to Regulate so he could take it back to the room. When she was pulling the gun out, it went off. She was not pointing it at Cardinas, who was running at this point. When the gun discharged, the bullet pierced her hand. She did not fire it again, although before her gun went off she heard a noise that sounded like a fire cracker. She was not sure whether it was a gunshot.

"At this point, [petitioner] saw Fermin [] by the cars. Regulate was with her. She did not point the gun at Fermin [] or ask him for money. Regulate's friend did. Everyone then ran away, and [petitioner] returned to the motel where she was staying. She never saw Cardinas fall; he was still running when she left.

"[Petitioner] gave the gun to Atherton, then left her children with him at the LaMirage. She wanted to leave because she knew she had been seen with a gun and she did not want to go to jail on a gun charge. She did not know Cardinas had been shot until she telephoned the motel later to check on her children. She was told Cardinas was dead and the police wanted to talk to her. She did not go to the police because her boyfriend said they should leave town.

"[Petitioner] denied telling detectives that she shot Cardinas. She told them the truth, but when Detective Vincent demanded more, she started agreeing with him and telling him what he wanted to hear." (*Meza*, *supra*, F025822.)

On July 27, 1995, the Kern County District Attorney filed an information charging petitioner with the first degree murder of Cardinas (§ 187, subd. (a), count 1), with the special circumstance that petitioner committed the murder while engaged in the commission or attempted commission of robbery (§ 190.2, former subd. (a)(17)(i)) and a

firearm enhancement (§ 12022.5, subd. (a)); and two counts of robbery (§ 212.5, subd. (c), count 2 (Alfredo), count 3 (Fermin)).

On January 22, 1996, a jury convicted petitioner of first degree murder (§ 187, subd. (a), count 1), two counts of robbery (§ 212.5, subd. (c), counts 2 & 3) and found true the robbery special circumstance and firearm enhancement. The trial court sentenced petitioner on count 1 to a term of life without the possibility of parole, with an additional term of four years for the firearm enhancement. On count 2, the trial court sentenced petitioner to the middle term of three years to be served consecutive to count 1. On count 3, the trial court sentenced petitioner to the middle term of three years to be served consecutive to count 2 with all but one year stayed until successful completion of counts 1 and 2.

In her direct appeal, petitioner argued there was insufficient evidence to support the robbery special circumstance (§ 190.2, former (a)(17)(i)) because the evidence did not show the murder was committed to carry out or advance the commission of the robbery. (*Meza*, *supra*, F025822.) This court disagreed and concluded:

> "The evidence was such that a rational trier of fact could have found that [petitioner] murdered Cardinas to prevent him from escaping and going for help, the arrival of which could have thwarted the robbery. Accordingly, the evidence sufficiently showed that the robbery was not merely incidental to the murder, but that the murder was performed to advance the commission of the robbery. The requirements of section 190.2, subdivision (a)(17) . . . have thus been met and the special circumstance finding is valid. [Fn. omitted.]" (*Ibid*.)

On June 24, 2019, petitioner, in propria persona, filed a petition for resentencing on her murder conviction pursuant to section 1170.95. In the form petition, petitioner stated a complaint, information, or indictment was filed against her that allowed her to be prosecuted under a theory of felony murder or murder under the natural and probable consequences doctrine; she was convicted of first or second degree murder at trial; and she could not now be convicted of first or second degree murder because of changes

made to sections 188 and 189, effective January 1, 2019. She also requested the court appoint counsel during the resentencing process. Petitioner did not check the boxes stating she was not the actual killer; she did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree; or that she was not a major participant in the felony or did not act with reckless indifference to human life during the course of the crime or felony. Lastly, petitioner did not check the box stating the murder victim was not a peace officer in the performance of his or her duties.

On June 28, 2019, the trial court appointed the public defender to represent petitioner. The People then filed a response arguing the petition should be dismissed based on the unconstitutionality of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437). Petitioner, through appointed counsel, filed a reply. The trial court denied the People's motion to dismiss based on the unconstitutionality of Senate Bill 1437. The People then filed a motion to dismiss the petition arguing that the jury found petitioner was the actual killer and that she was a major participant acting with reckless disregard for human life thereby establishing petitioner's ineligibility for resentencing relief. Petitioner submitted on the declarations made in her petition. On August 10, 2020, the trial court denied petitioner's petition for section 1170.95 resentencing without providing a statement of reasons.

A timely appeal followed.

## DISCUSSION

### I. Applicable Law

Effective January 1, 2019, the Legislature passed Senate Bill 1437 "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The bill

8.

accomplished this task by adding three separate provisions to the Penal Code. (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842–843.) Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[5] (§ 189, subd. (e); accord, *Gentile*, at p. 842.)

Finally, the bill added section 1170.95 to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above." (*Gentile*, at p. 843.) This procedure is available to persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter." (§ 1170.95, subd. (a).)

"Section 1170.95 lays out a process" for a person convicted of one of the aforementioned offenses "to seek vacatur of his or her conviction and resentencing." (*Gentile*, *supra*, 10 Cal.5th at p. 853.) First, an offender must file a petition in the sentencing court averring that:

---

[5] Additionally, section 189 was amended to allow for felony-murder liability where the victim is a peace officer. (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672.)

"(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;]

"(2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[; and]

"(3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(3); see § 1170.95, subd. (b)(1)(A); accord, *People v. Lewis* (2021) 11 Cal.5th 952, 959–960 (*Lewis*).)

Additionally, the petition shall state "[w]hether the petitioner requests the appointment of counsel." (§ 1170.95, subd. (b)(1)(C).)

If a petition fails to contain the required information and the information cannot be "readily ascertained" by the court, the petition may be denied without prejudice to the filing of another petition. (§ 1170.95, subd. (b)(2).) Otherwise, counsel must be appointed, if requested. (§ 1170.95, subd. (b)(3).) The prosecutor must file a response and the petitioner may file a reply. The trial court must then hold a hearing to determine if the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1170.95, subd. (c); accord, *Lewis*, *supra*, 11 Cal.5th at pp. 961–963, 967.) In making this determination, the court may rely on the record of conviction. (*Lewis*, at pp. 970–971.) The record of conviction includes, but is not limited to, jury instructions and verdict forms. (See generally *id*. at p. 972.) However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id*. at pp. 971–972.)

If the court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder[, attempted murder, or manslaughter] conviction and to resentence the

petitioner on any remaining counts." (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1170.95, subds. (c), (d)(1).) At the hearing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed," as well as the "procedural history of the case recited in any prior appellate opinion." (§ 1170.95, subd. (d)(3).) Hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of section 872 is inadmissible at the evidentiary hearing, unless made admissible by another exception to the hearsay rule. (§ 1170.95, subd. (d)(3).)

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

## II. Analysis

On November 18, 2020, petitioner, through her counsel, filed an opening brief with this court requesting that we independently review the entire record on appeal in this case as required by *Wende*, *supra*, 25 Cal.3d 436. In his opening brief, counsel declared he advised petitioner of the nature of the brief and that petitioner retained the right to file a supplemental brief on her behalf within 30 days of filing of the opening brief. This court sent petitioner a letter advising her of her right to file a supplemental brief, however, petitioner did not file a supplemental brief. Therefore, as required under *Wende*, we have independently reviewed the entire record and conclude petitioner is ineligible for section 1170.95 resentencing relief, as a matter of law.

11.

### A. Senate Bill No. 775

Effective January 1, 2022, the Legislature enacted Senate Bill No. 775 (2020-2021 Reg. Sess.) (Senate Bill 775), which amended section 1170.95. (Stats. 2021, ch. 551, § 2.) Section 1170.95 was amended, in pertinent part, to state:

> "After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. *If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so*." (§ 1170.95, subd. (c), italics added.)

Here, the petition was filed and denied prior to the enactment of Senate Bill 775. However, the amended statute applies since petitioner's case is not yet final. The court did not provide a statement of reasons for denying the petition without issuing an order to show cause, which is now required under section 1170.95 subdivision (c). Accordingly, we may affirm the denial of the petition only if petitioner was not prejudiced by the statutory error. (*Lewis*, *supra*, 11 Cal.5th at pp. 972–974; see *Watson*, *supra*, 46 Cal.2d at p. 836.)

### B. The Special Circumstance Finding is Dispositive

We conclude petitioner cannot demonstrate prejudice because the special circumstance finding establishes she is ineligible for resentencing as a matter of law. (See *Lewis*, *supra*, 11 Cal.5th at pp. 972–974; see also *Watson*, *supra*, 46 Cal.2d at p. 836.)

To be eligible for relief pursuant to section 1170.95, petitioner must not have been the actual killer, must not have acted with the intent to kill or malice aforethought, and must not have been a major participant in the underlying felony who acted with reckless indifference to human life. (§§ 188, subd. (a)(3), 189, subd. (e), 1170.95, subd. (a)(3); see *Gentile*, *supra*, 10 Cal.5th at p. 842.) Here, the jury found true the robbery special circumstance (§ 190.2, former subd. (a)(17)(i)). At the time of the offense, section 190.2,

subdivision (a)(17) imposed a sentence of death or life without the possibility of parole for a murder committed in the commission or attempted commission of a robbery (§ 190.2, former subd. (a)(17)(i)).  To find this special circumstance true, the jury was required to find either that petitioner was the actual killer, *or* that petitioner aided and abetted in the murder with intent to kill, *or* that petitioner was a major participant who aided and abetted in the commission of an enumerated felony and acted with reckless indifference to human life.  (§ 190.2, subds. (b), (c), (d).)  In other words, "[t]he language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes."  (*People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 419.)  Therefore, the true finding on the special circumstance allegation establishes the jury made the requisite findings necessary to sustain a murder conviction under the law, as amended by Senate Bill 1437.  Accordingly, petitioner is ineligible for resentencing relief under section 1170.95 and was not prejudiced by the court's statutory error in failing to provide a statement of reasons for denial of the petition.

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

## DISPOSITION

The order dismissing petitioner's section 1170.95 petition is affirmed.

13.