Filed 12/5/22  In re J.R. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B318442 (Los Angeles County Super. Ct. No. 20CCJP04003-A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. V.R., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Tara L. Newman, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

V.R. (Mother) appeals an order terminating her parental rights to her son, J.R. (Welf. & Inst. Code, § 366.26.)[1] She contends that the requirements of the Indian Child Welfare Act (ICWA) are unmet. (25 U.S.C.S. § 1901 et seq; Welf. & Inst. Code, § 224 et seq.) No one asked extended family members if J.R. might be Indian. (§ 224.2, subd. (b).)

We conclude that any deficiency in the ICWA inquiry did not cause a miscarriage of justice. (Cal. Const., art. VI, § 13.) Mother was raised by her biological parents and denied Indian heritage. She cites no evidence showing that her knowledge of her heritage is incorrect or that J.R. has Indian ancestry. Because there is no reason to believe J.R. is Indian, any failure to inquire of extended family members was harmless. We affirm.

### FACTS AND PROCEDURAL HISTORY

J.R. was detained at the hospital at birth in July 2020 when Mother had a psychotic episode. She was screaming, yelling, and refusing medication; she did not feed J.R. or change his diapers. A doctor refused to release J.R. to Mother because her mental state created a risk of harm. Mother was hospitalized three times since the end of 2019, under section 5150.

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

The maternal aunt (MA) said Mother is mentally ill and has acted erratically since she stopped taking medication in 2019. Mother lived with the maternal grandfather (MGF) until 2019, then with the maternal grandmother (MGM) until early 2020. MA felt Mother cannot care for herself or a baby and fears that Mother would make it difficult for the family to care for J.R.

A social worker (CSW) asked Mother if she or J.R. have Indian ancestry. She replied, "don't we all have Native American in us." When asked a second time, Mother said "no." She refused to identify J.R.'s father. She is homeless but planned to take J.R. to a shelter and did not want help from MA, MGM, or mental health services. She refused to say where she intended to stay. CSW categorized J.R. as being at "high risk" for abuse or neglect because Mother is unable or unwilling to address her mental health issues or care for him.

Respondent Los Angeles County Department of Children and Family Services (DCFS) filed a petition alleging that J.R. is at substantial risk of serious harm from Mother's inability to supervise, protect, or regularly care for him. She has serious mental health issues; at the hospital, she threw objects, refused to allow the pediatrician to examine J.R., and removed a security device from the newborn. She has a history of mental illness and involuntary hospitalizations. An Indian Child Inquiry form attached to the petition states that Mother denied any Indian ancestry for herself and J.R.

Mother waived her appearance at the detention hearing on August 3, 2020. On that day, an unsigned Parental Notification of Indian Status form (ICWA-020) was filed stating, "I have no Indian ancestry as far as I know."

The court found that Mother has no Indian heritage, and no reason to know that J.R. is an Indian child. It detained J.R. from Mother and ordered her to inform DCFS, her attorney, and the court of any new information relating to ICWA status. The court ordered due diligence to locate J.R.'s father after Mother identified three men. DCFS was to ask Mother's relatives if they wished to care for J.R., whose caregivers reported that Mother was threatening them.

In the jurisdiction report, DCFS indicated that it was searching for J.R.'s father. Mother denied that her estranged husband, whom she has not been with for 17 years, is J.R.'s father. A man who had a "casual relationship" with Mother said he would think about a paternity test. He said that Mother's text messages during pregnancy were incoherent; he had concerns about her mental health and homelessness.

Mother said she was initially diagnosed with depressive disorder in 2000 and later with bipolar disorder. She stopped using prescribed medication in 2019, had multiple involuntary hospitalizations, and resumed medication after J.R.'s birth. She is 40 years old. Her parents divorced when she was a child and shared custody of her. She has a positive relationship with them. She does not live with her husband, who drinks and engaged in domestic violence with her. Mother's long-time therapist confirmed Mother's diagnoses of major depressive episodes and bipolar disorder.

MA said Mother has been on "a slippery slope" since she stopped taking medication and cannot care for J.R. due to mental illness. She lived with MGM and MA until January 2020, then wandered the streets. Mother previously stopped medicating a few years earlier and exhibited challenging behavior.

On October 1, 2020, the court sustained the petition.[2] It found that Mother's husband is not J.R.'s father; due diligence was underway to determine paternity. J.R. was in shelter care. His caregivers asked DCFS to place the baby elsewhere, due to Mother's threats.

At disposition on October 21, 2020, the court listed three men as alleged fathers. It had no reason to know that J.R. is an Indian child. It declared J.R. a dependent of the court and found by clear and convincing evidence that it is necessary to remove J.R. from Mother for his safety. She was given monitored visits, ordered to use prescribed psychotropic medications, take parenting classes, and participate in counseling. The alleged fathers did not receive reunification services.

In January 2021, DCFS reported that Mother attends therapy and consistently visits J.R. In May 2021, it reported that Mother was behaving inappropriately with social workers and J.R.'s caregivers. She was "verbally aggressive, controlling, nonsensical and threatening," late to visits, and cancels at the last minute. DCFS could not confirm if she was compliant with her medications because she would not sign a release form. Her visits with J.R. went well but his caregivers got permission to cease all communication with Mother. On June 15, 2021, the court continued services for Mother.

In its October 2021 status report, DCFS stated that Mother is "hostile" to social workers and visitation staff. She refused to speak to them or sign a release allowing her psychiatrist to speak

---

[2] Mother attended the adjudication and disposition hearings. We do not know if she was questioned because there are no reporter's transcripts of the proceedings.

with DCFS about her medication compliance and progress. Mother's therapist said she is under stress from family issues and from having DCFS involved in her life. The therapist felt that Mother would be a devoted, stable, and appropriate parent. However, DCFS had "serious concerns" about her mental state and capability to care for J.R.; she failed to attend most of her scheduled visits with him. J.R. was bonding with his caregivers, who take good care of him. Mother completed a parenting course.

J.R. was assessed as being at "very high" risk of neglect in Mother's care. Though she wants to care for J.R., she has not demonstrated progress by communicating with CSW, visiting regularly, or attending J.R.'s medical appointments. She has a volatile relationship with her family and cannot appropriately engage with CSW or the caregivers. For over a year, she has not shown an ability to safely care for J.R.

At the hearing on October 12, 2021, DCFS and J.R.'s attorney asked the court to terminate reunification services. Noting that J.R. is under the age of three, the court terminated services. Mother's progress was not substantial; she refused to release medical information to DCFS; she missed most visits; and her behavior is inappropriate. There is no substantial probability J.R. could return to Mother within 60 days. The court set a permanent plan hearing.

DCFS reported that the whereabouts of one alleged father are unknown, after a due diligence search. Two alleged fathers were given notice of the section 366.26 hearing by publication; the third alleged father and Mother were personally served with notice. J.R.'s caregivers wish to adopt him. They have cared for him since he was three months old, their biological children are attached to him, and he is bonded with them.

6

In February 2022, DCFS reported that J.R. has "sporadic contact" with Mother, who "remains inconsistent with her visitation and periodically falls out of contact with [the social workers] for long periods of time. When mother does participate in visitation, the visitation is appropriate." Mother was warned multiple times about the importance of consistent visitation and behavior with social workers that is intimidating, loud or confrontational, especially in front of J.R.

Mother did not attend the permanent plan hearing on February 8, 2022, though she called the court and was aware of the hearing. Her attorney did not question the adequacy of the ICWA inquiry. The court found that continued jurisdiction was necessary, DCFS had provided reasonable services, and Mother's visits were sporadic and sometimes inappropriate. J.R. is adoptable and no exceptions to adoption apply. It terminated parental rights.

### DISCUSSION

We review ICWA findings under a substantial evidence standard. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.) If undisputed facts show the initial inquiry into Indian heritage was deficient, we determine whether the deficiency invalidates findings that ICWA does not apply. (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777, review granted Sept. 21, 2022, S275578, (*Dezi*).) DCFS concedes it did not interview Mother's extended relatives about J.R.'s possible Indian ancestry but contends that the error is harmless. We agree.

ICWA establishes standards to follow before an Indian child is removed from parental custody. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881–882.) An "Indian child" is "either (a) a member of an Indian tribe or (b) is eligible for membership in an

7

Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C.S. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a).) From "the initial contact" with a family, DCFS and the court have "an affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2, subd. (a).) This means "asking the child, parents, legal guardian, Indian custodian, extended family members, and others who have an interest in the child . . . whether the child is, or may be, an Indian child." (*Id.*, subd. (b).) At initial appearances, the court must ask if a participant knows whether the child is Indian. (*Id.*, subd. (c).) Additional inquiry and notice to tribes is required only if there is "reason to believe" or "reason to know" that the child is Indian. (*Id.*, subds. (d), (e) & (f).)

Mother does not claim membership in a federally recognized tribe or assert that J.R. is eligible for membership as the child of a member of an Indian tribe. (25 U.S.C.S. § 1903(4).) She was questioned by DCFS and denied Indian ancestry. DCFS spoke to MA but did not inquire about Indian ancestry or seek contact information for other relatives. Mother argues that this lapse mandates reversal.[3]

Some courts have held that failure to question extended family members requires automatic reversal "no matter how 'slim' the odds are that further inquiry on remand might lead to a different ICWA finding by the juvenile court." (*Dezi*, *supra*, 79 Cal.App.5th at p. 777, rev.gr.) We do not follow the automatic reversal rule. (*Id.* at pp. 782–785.)

---

[3] Mother does not argue that DCFS improperly failed to determine if J.R.'s father is Indian. The identity of the father was never established.

"In our view, an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding. For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Dezi, supra,* 79 Cal.App.5th at p. 779, fn. omitted, rev.gr.)

The record shows no reason to believe J.R. is an Indian child. Mother denied Indian heritage. She was raised by, and until recently lived with, her biological parents. Unlike the mother in *In re Y.W.* (2021) 70 Cal.App.5th 542, 548, who was adopted at age two and had no information about her biological family, there is no concern that Mother does not know her heritage. Though Mother has a history of mental illness, she regularly attends therapy and completed a parenting course. There is no indication that she is too ill to know who she is. In short, Mother points to nothing in the record indicating possible Indian heritage nor does she make a proffer on appeal of such heritage. (*Dezi, supra,* 79 Cal.App.5th at p. 786, rev.gr.)

A judgment cannot be set aside unless it has resulted in a miscarriage of justice, meaning "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Dezi, supra,* 79 Cal.App.5th at p. 779, rev.gr.)

Mother has not shown a miscarriage of justice. She denied Indian heritage to CSW, and never said anything to the contrary to the court. Her attorney did not object to the adequacy of the

ICWA inquiry, or to the court's ICWA findings, or suggest that Mother has Indian ancestry. (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1013.)

**DISPOSITION**

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.

10